# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

KEVIN JETER, JOE A. JETER,　　　　　　)
BARBARA LUCAS, JAMES H. MILLER,　　)
SHARON RIGSBY MILLER,　　　　　　　)
LARRY SMITH, and JANICE SUE PARKER,　)
individually and as Class Representatives　　)
on Behalf of All Similarly-Situated Persons,　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　　Plaintiffs,　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　　　)　　Case No. 12-CV-411-TCK-PJC
　　　　　　　　　　　　　　　　　　　)
WILD WEST GAS, LLC,　　　　　　　　　)
WILD WEST GAS, INC.,　　　　　　　　　)
BULLSEYE ENERGY INC.,　　　　　　　　)
FOUNTAINHEAD, LLC, and　　　　　　　)
KRS&K, an Oklahoma　　　　　　　　　)
General Partnership,　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　　Defendants.　　　　　　　　)

## OPINION AND ORDER

Before the Court is Plaintiffs' Motion to Amend Complaint to Add Parties and Assert

Additional Claims (Doc. 96) ("Motion to Amend") pursuant to Federal Rule of Civil Procedure

15(a). Plaintiffs seek to file the Second Amended Complaint ("SAC") attached as Exhibit A to the

Motion to Amend. Also before the Court is Defendants Wild West Gas, LLC, Wild West Gas, Inc.,

Bullseye Energy Inc., and KRS&K's Motion Requesting this Court to Decline to Exercise

Jurisdiction (Doc. 113) ("Motion to Decline Jurisdiction").[1]

---

[1] Also pending before the Court are Plaintiffs' Motion to Certify a Class Against Wild
West Gas, LLC & Bullseye Energy, Inc. (Doc. 114) and Defendants' Motion to Strike the
Proposed Amended Class Definition (Doc. 128). Those motions are not addressed in this
Opinion and Order.

## I.    Procedural History

Plaintiffs, individuals who have owned and/or currently own mineral interests in certain oil and gas leases, filed this class action lawsuit in federal court pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2). Defendants, the lessees, moved to dismiss the lawsuit on grounds that the Court lacked jurisdiction under CAFA because certain CAFA exceptions applied. On August 17, 2014, the Court denied Defendants' motion to dismiss, holding that Defendants failed to meet their burden of proving application of CAFA exceptions. The Court denied Defendants' motion to reconsider that ruling but permitted Defendants to file additional jurisdictional motions by a date certain. The parties proceeded with discovery. On February 27, 2015, Plaintiffs filed the Motion to Amend and attached the proposed SAC. Subsequently, Defendants filed a second Motion to Decline Jurisdiction, which is premised upon the allegations in the FAC.

## II.    Allegations in the FAC

Plaintiffs allege that they and members of the putative class "have owned or currently own oil, gas, and mineral interests in lands and producing wells that have been drilled on land that is located" in the Northern District of Oklahoma. (FAC ¶¶ 15.) Plaintiffs allege that Defendants Wild West Gas, Inc., Wild West Gas, LLC, Bullseye Energy, Inc., Fountainhead LLC,[2] and KRS&K "own or owned, and/or control or controlled the Leases and/or working interests created by the Leases" and that they "act or acted as, and/or control or controlled, operators of the wells that were drilled pursuant to the Leases." (FAC ¶ 16.) Plaintiffs allege that Defendants "have taken and continue to

_____

[2] On September 8, 2015, the parties filed a Joint Stipulation of Dismissal of Defendant Fountainhead LLC.

take unauthorized and unlawful deductions from the royalties belonging to Plaintiffs and the Class," resulting in underpayment. (*Id.* ¶ 21.) The FAC contains the following causes of action: Count I - Breach of Implied Covenants, Breach of Leases, and Violation of Oklahoma Law; Count II - Breach of Fiduciary Duties and Fraud by Concealment; and Count III - Accounting.

> Plaintiffs seek certification of the following class:
>
> All non-excluded persons and entities who, as of the date of filing of this Complaint, are or were royalty owners in producing gas wells located in the Northern District of Oklahoma where one or more of the Defendants is or was a lessee and/or operator and/or working-interest owner under the Leases, and/or where the Defendants control or controlled the operators, working-interest owners, and/or lessees under the Leases. The Class does not include overriding royalty owners or other owners who derive their interest through the oil and gas lessee. The Class does not include any wells located on federal, state, county, municipal, military, or Indian lands in which one or more Defendants own any interests.
>
> The persons or entities excluded from the Class are persons or entities who are not citizens of any State on the date of filing this Complaint, persons or entities who have settled or released their royalty-related claims with any of the Defendants as of the date of filing of this Complaint, any Indian Tribe or Nation, federal, state and local governments, including agencies, departments, or instrumentalities of the United States of America and State of Oklahoma (including public trusts, counties, and municipalities), publicly traded oil and gas exploration companies and their affiliates, and persons or entities that Plaintiffs' counsel are prohibited from representing under the Oklahoma Rules of Professional Conduct.
>
> Other persons or entities excluded from the Class are persons or entities who have entered into Leases with any of the Defendants which contain specialized provisions allowing the Defendants to subtract expenses from royalties that would otherwise be contrary to Oklahoma law.

(*Id.* ¶ 33.)

### III. Allegations in the Proposed SAC

#### A. Class Allegations

There is no change to the wording of the class definition from the FAC to the SAC. However, Plaintiffs added a footnote to the last paragraph of the above-quoted class definition stating: "Additionally, sub-classes may be proposed, particularly, for class members who have leases allowing for deduction of costs and have been overcharged for these costs." (SAC n.1)[3]

#### B. New Parties and Claims

In the proposed SAC, Plaintiffs seek to: (1) remove Wild West Gas, Inc. as a Defendant;[4] (2) add five new corporate Defendants – CEP Mid-Continent, LLC ("CEP"), Gashoma, Inc. ("Gashoma"), Purgatory Creek Gas, Inc. ("Purgatory"), Redbird Oil ("Redbird"), and White Hawk Gas, Inc. ("White Hawk"); (3) add six new individual Defendants – Robert Kane, Louise Kane Roark, Ann Kane Seidman, Mark Kane,[5] Pamela Brown, and Gary Brown;[6] and (4) assert four new claims, all arising under the federal Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1962(c), (d). Plaintiffs separated the breach of fiduciary duties and fraud claims into

---

[3] In their pending Motion to Certify a Class, Plaintiffs explained that Plaintiffs Barbara Lucas and James H. Miller seek to certify this "sub-class." Defendants have filed a Motion to Strike the Proposed Amended Class Definition Set Forth in Plaintiffs' Motion to Certify a Class, arguing that Plaintiffs are making an untimely attempt to expand the scope of the class to a group that was expressly excluded from the class definition.

[4] The SAC asserts that Wild West Gas, Inc. was the former name of Defendant Wild West Gas, LLC. (SAC ¶ 10.) Thus, Plaintiffs now concede that Wild West Gas, LLC ("Wild West") is the proper name of this Defendant.

[5] These four individuals are siblings and members of the Kane family who operate and/or own interests in various corporate entities named as Defendants in the SAC.

[6] Pamela and Gary Brown are employees of Wild West and White Hawk.

separate counts. Therefore, the SAC contains a total of eight claims – four common law claims and four civil RICO claims.

In the SAC, Plaintiffs allege the following with respect to the various corporate entities. KRS&K is an Oklahoma general partnership comprised of the four Kane siblings. CEP is a Delaware limited liability company. KRS&K and CEP each own a 50% interest in Bullseye Energy, Inc. ("Bullseye Energy"), which is the entity that "owns the leases of the Plaintiffs and the prospective class members." (SAC ¶ 6.) In addition to owning the alleged lessee, KRS&K and CEP each own a 50% interest in the following entities that allegedly provide "services for the gathering of natural gas from the leases of Plaintiffs:" Gashoma, Purgatory, White Hawk, and Wild West. In addition, KRS&K and CEP each own a 50% interest in a separate entity known as Bullseye Operating and New Cotton Valley Transmission, LLC ("New Cotton"), neither of which is named as a Defendant in the SAC. There are no specific allegations regarding Redbird's involvement with the leases, although there are some scattered references to Redbird as an entity that controls the leases.

Plaintiffs contend that they learned, only through discovery and after filing the FAC, of the "incestuous relationship among the 'Kane Family' and their total control of the entities responsible for the theft of millions of dollars of royalties, over the years, and still continuing today." (Reply in Support of Mot. to Amend 6 (footnote omitted).) This "incestuous relationship" between numerous entities controlled by the Kane family, combined with the fraudulent schemes already alleged, resulted in Plaintiffs seeking amendment to add the civil RICO claims.

### C. Royalty Underpayment/Fraudulent Schemes

In the SAC, Plaintiffs allege they were underpaid oil and gas royalties from 2000-2015. Defendants allegedly deprived Plaintiffs of royalties owed in two ways. First, Plaintiffs allege that the lessee Defendants calculated royalties based upon "self-dealing sales to affiliated purchasers instead of . . . the sale of natural gas to the ultimate end purchasers." (SAC ¶ 31.) Plaintiffs allege that Defendants are "selling natural gas to themselves . . . at a reduced rate and paying the royalty owners on this fraudulent skimming scheme." (*Id.*) Essentially, Plaintiffs allege that the first sale at the wellhead, upon which royalties were calculated, was akin to an "intra-company gas sale," rather than an arms-length sale reflecting the actual market price. *See generally Howell v. Texaco, Inc.*, 112 P.3d 1154, 1160 (Okla. 2004) (holding that "an intra-company gas sale cannot be a basis for calculating royalty payments" and that "[w]henever a producer is paying royalty based on one price but it is selling the gas for a higher price, the royalty owners are entitled to have their payments calculated based on the higher price").

Second, Plaintiffs allege that Defendants deducted costs of making the gas marketable from Plaintiffs' royalties, in violation of the leases and Oklahoma law. *See generally Wood v. TXO*, 854 P.2d 880, 882 (Okla. 1993) (holding that lessee's duty to market generally includes the cost of preparing the gas for market and that such costs may not be deducted from royalties).[7] In addition to simply taking the wrongful deductions, Plaintiffs allege that Defendants misrepresented and/or concealed the deductions in the royalty remittance statements sent to Plaintiffs. Plaintiffs allege that the lessees are failing to pay the proper amount of royalties, while the other Kane-related entities

---

[7] In citing *Howell* and *Wood*, the Court is not indicating how or if these cases actually apply to this case. The Court is only attempting to explain Plaintiffs' allegations by reference to Oklahoma law.

– namely, Wild West, White Hawk, Purgatory and non-party New Cotton – have "created and continue to use various physical assets, arrangements, and structures related to the processing and sale of the Production, and have used and continue to use . . . [them] to take deductions to which none of them is entitled . . . in violation of the Leases and in violation of Oklahoma law."  (SAC ¶ 30.)

### D.     Jurisdiction

Based on the proposed federal RICO claims, the SAC asserts 28 U.S.C. § 1331 as a basis for federal subject matter jurisdiction.  (SAC ¶ 21.)  This is in addition to 28 U.S.C. § 1332(d)(2), which is asserted in both the FAC and SAC as a basis for federal subject matter jurisdiction.[8]

## IV.    Motion to Amend

Federal Rule of Civil Procedure 15(a)(2) provides that Courts should grant leave to amend when justice so requires.  District courts "may withhold leave to amend only for reasons such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of [the] amendment."  *See U.S. ex. rel. Ritchie v. Lockheed Martin Corp.*, 558 F. 3d 1161, 1166 (10th Cir. 2009) (internal quotation marks omitted).

In this case, Defendants oppose the addition of all new parties and claims in the SAC only on grounds of futility.  "A proposed amendment is futile if the complaint, as amended, would be subject to dismissal."  *Fields v. City of Tulsa*, 753 F.3d 1000, 1012 (10th Cir. 2014).  A complaint

---

[8]  In the pending Motion to Decline Jurisdiction, Defendants only address the allegations in the FAC and therefore assume that the only asserted basis for federal jurisdiction is 28 U.S.C. § 1331(d)(2).  If the Court permits amendment to add the RICO claims, the Motion to Decline Jurisdiction becomes moot because there will exist federal question jurisdiction.  If not, the Court must proceed to analyze the Motion to Decline Jurisdiction.

is subject to dismissal under Federal Rule of Civil Procedure 12(b)(6) if the plaintiff fails to allege facts that would permit the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Because the futility analysis relies upon a Rule 12(b)(6) standard, the Court may not consider evidence outside the pleadings. *Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417, 420 (6th Cir. 2000) ("When analyzing the futility of a proposed amendment, the court uses the same analysis for a motion to dismiss under Rule 12(b)(6), and matters outside the pleadings may not be considered.").

In support of their argument, Defendants submitted a limited amount of evidence, including the declaration of Robert Kane regarding the ownership of various entities and related documents; a sample oil and gas lease; and two sample royalty remittance statements. (*See* Resp. to Mot. to Amend, Exs. 1 and 2.) Plaintiffs did not submit any evidence outside the pleadings. The Court finds that the sample oil and gas leases and royalty remittance statements are central to the allegations in the SAC, and Plaintiffs have not disputed their authenticity. Thus, the Court may consider these documents without converting the futility analysis under Rule 12(b)(6) to a Rule 56 analysis. *See Thomas v. Kaven*, 765 F.3d 1183, 1197 (10th Cir. 2014). In contrast, Kane's assertions in his declaration contradict allegations in the SAC and have not been considered by the Court in its futility analysis.

### A. Proposed Counts 1 and 2

Proposed Count 1 is entitled "Breach of Implied Covenants, Breach of Lease, and Violation of Oklahoma Law." (SAC ¶¶ 45-48.) The Court construes Count 1 to assert breach of the leases, breach of any implied covenants flowing from the leases, and breach of the duty of good faith and fair dealing inherent in all Oklahoma contracts. Plaintiffs seek to add White Hawk, Purgatory,

Redbird, Gashoma, and CEP to the claim. Proposed Count 2 is entitled "Breach of Fiduciary Duties" but alleges breach of a duty of good faith and fair dealing. The Court construes Count 2 as seeking to assert an independent tort claim for either breach of the duty of good faith and fair dealing or breach of fiduciary duty. Plaintiffs seek to add Redbird, Gashoma, and CEP to this claim. As in the FAC, both claims are also asserted against Wild West, Bullseye Energy, and KRS&K.

Defendants assert, citing and relying upon Robert Kane's declaration, that only Bullseye Energy and CEP have entered into leases and are therefore in privity of contract with Plaintiffs. Defendants contend that only these two entities are proper parties to Counts 1 and 2. Defendants further argue that, even for those entities in privity of contract with Plaintiffs, Count 2 fails because Oklahoma law does not recognize fiduciary duties flowing between an oil and gas lessor and lessee.

In their reply brief, Plaintiffs stated that they have no "desire or intention to assert any breach of implied covenants, breach of contract/lease, and breach of fiduciary duty claims against any parties that are not in privity of contract" with Plaintiffs and that the pleadings should "conform to the evidence." (Reply in Support of Mot. to Amend 10.) Plaintiffs offered no other substantive arguments with respect to Counts 1 and 2.

### 1.     Breach of Contract

The Court concludes that the SAC fails to state a contract-based claim for relief against proposed Defendants Gashoma, Purgatory, White Hawk and original Defendant Wild West. The SAC does not allege or create any reasonable inference that these entities may own any relevant leases or otherwise be in a contractual relationship with Plaintiffs. Instead, the SAC alleges that these entities provide gathering services for the leases. While these gathering entities may be the first purchaser of gas from Bullseye Energy, this does not mean they are somehow in privity of

contract with the royalty owners. The involvement of the "gatherers" as the first purchaser/second "seller" may be relevant to whether the lessee is in breach. However, Plaintiffs have failed to allege facts or create the inference that these entities could have breached contracts (or implied covenants flowing therefrom) with Plaintiffs.[9] Therefore, Count 1 may proceed only against Bullseye Energy, CEP, and KRS&K.[10]

### 2. Breach of Fiduciary Duty

As explained above, Plaintiffs represented that they seek only to assert this claim against entities with which they are in privity of contract. Thus, for the same reasons explained above, the proposed addition of Redbird and Gashoma is futile, as there are no assertions that these entities entered into contracts with Plaintiffs. Further, sua sponte dismissal of Wild West is proper for the same reasons.

Even with respect to entities potentially in privity (Bullseye Energy, KRS&K, and CEP), Defendants argue that proposed Count 2 is nonetheless subject to dismissal because: (1) in ordinary commercial contracts, violation of the duty of good faith and fair dealing does not give rise to independent tort liability, and (2) a lessee does not, as a general rule, owe fiduciary duties to a lessor as a result of executing an oil and gas lease.

---

[9] If Plaintiffs have evidence demonstrating that any of the "gathering" Defendants are in a contractual relationship with Plaintiffs, they may file a motion to reconsider within ten days of the Court's entry of this Order.

[10] In his declaration, Robert Kane asserts that KRS&K assigned its ownership in the leases to Bullseye in 1999. However, such assertion is based on evidence outside the pleadings. Unlike the "gatherer" Defendants, Plaintiffs have pled facts that would permit an inference of ownership of the leases by KRS&K, and such claim may not be deemed futile for purposes of Rule 12(b)(6).

The SAC fails to state any plausible tort claim for breach of the duty of good faith and fair dealing and/or breach of fiduciary duty arising from the leases. For ordinary commercial agreements, any breach of the duty of good faith and fair dealing merely results in contractual damages and not independent tort liability. *See Wathor v. Mut. Assurance Adm'rs, Inc.*, 87 P.3d 559, 561 (Okla. 2004). Plaintiffs have not cited, and the Court has not located, any cases indicating that oil and gas leases fall outside of this general rule. Further, the Oklahoma Supreme Court has expressly held that "lessees under an oil and gas mining lease" are "under no obligation to [lessors] other than to pay the rent and royalty provided in said lease and if they breach[] this duty, then their liability [is] purely a contractual one and in no sense fiduciary." *Bunger v. Rogers*, 112 P.2d 361, 363 (Okla. 1941); *see also Krug v. Helmerich & Payne, Inc.*, 320 P.2d 1012, 1017-18 (Okla. 2013) (citing rule in *Bungers* with approval and explaining one exception that is not applicable here). Accordingly, the Court holds that amendment is futile as to proposed new Defendant CEP. In the interest of judicial economy, the Court sua sponte dismisses Count 2 as to Bullseye Energy for the same reasons. Thus, Count 2 may not proceed as an independent tort claim against any Defendant.[11]

## B. Proposed Count 3 - "Scheme to Defraud"

Because it is listed separately from the civil RICO claims, the Court construes Count 3 as a common-law fraud claim. Plaintiff alleges that Bullseye Energy, KRS&K, Redbird, Gashoma, and CEP defrauded and continue to defraud the proposed class. Defendants argue that this claim is futile

---

[11] Plaintiffs may, however, assert breach of the duty of good faith and fair dealing as part of their breach of contract claim and in pursuit of contractual damages.

because (1) it is not pled with the requisite particularity under Federal Rule of Civil Procedure 9(b), and (2) it is barred by the statute of limitations.[12]

### 1. Rule 9(b)

Rule 9(b) provides: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other conditions of mind of a person may be averred generally." Fed. R. Civ. P. 9(b). The Tenth Circuit requires a complaint alleging fraud to set forth the time, place, and contents of the false representation, the identity of the party making the false statements, and the consequences of the statements. *Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1236 (10th Cir. 2000). The purpose of these requirements is to provide the defendant with fair notice of a plaintiff's claims and the factual ground upon which they are based. *Id.*

Plaintiffs contend that Defendant lessees underpaid oil and gas royalties due and owing since 2000. Plaintiffs allege that these underpayments *were also fraudulent* because Defendants: (1) intentionally misinformed Plaintiffs (via the monthly royalty statements mailed to Plaintiffs) that zero deductions were being taken from their royalty payments; and (2) concealed that sales were being made to affiliated purchasers.

With respect to the entities possibly in privity of contract with Plaintiff (Bullseye Energy, CEP, and KRS&K), fraud is pled with sufficient particularity. First, as to alleged concealed deductions, the alleged fraud occurred every month from 2000 to the present on the monthly royalty payments. The alleged speaker was the respective lessee sending the royalty payment. The

---

[12] Defendants did not argue that the fraud claim is an extracontractual remedy. *See generally Elliot Indus. LP v. BP Am. Corp.*, 407 F.3d 1901, 1116 (10th Cir. 2005); *Anderson Living Trust v. ConocoPhillips Co., LLC*, 952 F. Supp. 2d 979, 1043-44 (D.N.M. 2013).

misrepresentation occurred when the lessee misrepresented to Plaintiffs that no deductions were taken from their royalty payments. Lessees are on notice of the what, when, where, and how the fraudulent statements were made. Second, as to alleged self-dealing, the sales upon which royalties were calculated were repeatedly made by the lessee to an "affiliated" purchaser, rather than to an arms-length purchaser. Although the dates of each sale are not alleged, specific dates are not necessary to provide notice of the nature of the fraudulent scheme. The dates and times are every "first sale," which occurred at the wellhead and upon which royalties were based, when a second sale was later made by the Kane-related entity at a better market price. If the Defendant was a lessee, it was necessarily involved in the "first sale" to some other Kane-related entity.

With respect to Redbird and Gashoma, the SAC lacks details or particularity indicating when, where, and how they committed fraud against Plaintiffs. Because this is a second amendment and because Plaintiffs had the benefit of some discovery, the Court will not grant leave to add further specificity with respect to these other entities. Therefore, Count 3 shall not proceed against Redbird or Gashoma.

## 2. Statute of Limitations

Oklahoma has a two-year statute of limitations on fraud claims. Okla. Stat. tit. 12, § 95(3). The clock begins to run upon discovery of the fraud, and "[f]raud is deemed to have been discovered when, in the exercise of reasonable diligence, it could have or should have been discovered." *McCain v. Combined Commc'ns Corp. of Okla., Inc.*, 975 P.2d 865, 867 (Okla. 1998). Defendants contend that Plaintiffs could or should have discovered the allegedly fraudulent concealment of deductions as early as 2004, rendering any claims for underpayments accruing prior to July 24, 2008 (four years prior to filing of the Complaint) untimely.

In support of their argument, Defendants rely upon a sample royalty statement containing the following fine-print language at the bottom of the statement:

> *Payment is made based upon all proceeds paid to the producer under a contract between the producer and its purchaser (including affiliated purchasers). The contract authorizes the deduction of all gathering, transportation, compression, and similar charges incurred by the purchaser, directly or indirectly, from the amount paid to the producer.

(Resp. to Mot. to Amend, Ex. 1-D.) The asterisk appears under a column of the remittance statement entitled "DEDUCTS." Thus, when a lessee looks at the "DEDUCTS" column, he is directed to the above-quoted language warning him that the buy/sell contract (1) may be between two affiliated entities, and (2) authorizes deductions from the sale price for gathering, transportation, and compression, *i.e.*, authorizes a practice that, according to Plaintiffs, is contrary to Oklahoma law. Defendants contend that "Plaintiffs were put on notice that deductions *were being taken* from the proceeds received from affiliated purchasers and used to calculate Plaintiffs' and the proposed class members [sic] royalties, because beginning in 2004, the remittance advices sent to Plaintiffs along with their royalty checks . . . began including such information." (Resp. to Mot. to Amend 10 (emphasis added).)

Plaintiffs argue that, notwithstanding any warning in the statements regarding the possibility of deductions, nothing could have caused Plaintiffs to discover that these deductions were actually being taken, given then that the "DEDUCT" column always contained a "0." Plaintiffs essentially contend that the asterisk warned them of a possible injury but then the "0" lulled them into believing no injury was occurring.

The remittance statement does not, standing alone, establish that the statute of limitations was triggered. The asterisked language would lead a reasonably prudent lessor to be on notice that

14

Defendants' buy/sell contracts authorized (or attempted to authorize) deductions from the amount paid to the producer. However, nothing on the invoices appears to alert a reasonably prudent lessor that deductions were actually taken when there is a "0" listed in the "deduct" column. The asterisked language merely informs the lessor that the lessee's contract with buyers (including affiliated buyers) *authorizes* deductions from the amount the seller receives as a purchase price. A reasonably prudent lessor may still expect any such deductions to be listed, if any were taken. This is particularly true given that there is a column that expressly refers to language warning of the possibility of deductions being taken. Testimony and other record evidence, combined with this language on the statements, may serve to establish actual or inquiry notice at later stages of the proceedings. However, for purposes of a Rule 12(b)(6) motion, Defendants have failed to demonstrate that Plaintiffs' fraud claims are untimely based purely on language in the remittance statements.

### C.     Proposed Count 4 - Accounting

In this Count, Plaintiffs seek "an accounting on gross production, payment of royalties, and all royalty deductions (as well as) the true prices that Defendants CEP, Wild West, White Hawk, Purgatory, Bullseye Energy, KRS&K, Fountainhead, Redbird, Gashoma received for the sale of hydrocarbons." (SAC ¶ 70.) Defendants argue that only lessees could potentially owe any duty to account and that dismissal is proper as to all other Defendants. Plaintiffs made no substantive arguments in its reply brief regarding Count 4, thereby conceding the arguments made by Defendants.

For reasons explained above, the SAC alleges three entities that are potentially in privity of contract with Plaintiffs – Bullseye Energy, KRS&K, and CEP. While financial information of other

entities could possibly be obtained through discovery or other means, the Court agrees that other entities are not subject to any duty of "accounting" to Plaintiffs. Therefore, amendment is futile as to Wild West, White Hawk, Purgatory, Redbird, and Gashoma. Count 4 shall proceed only against Defendants Bullseye Energy, KRS&K, and CEP.

### D. Proposed Counts 5-8 - RICO Claims

Count 5 is asserted by several named Plaintiffs against Defendant Robert Kane pursuant to 18 U.S.C. § 1962(c) and (d). The SAC alleges that the RICO "enterprise" consists of Wild West, White Hawk, and Purgatory. These three entities are referred to in the SAC as the "Civil RICO Enterprise." Kane is President of White Hawk and Purgatory and managing partner of Wild West. In his role as managing partner of Wild West, Kane allegedly committed "predicate acts" of mail fraud, in violation of 18 U.S.C. § 1341, and wire fraud, in violation of 18 U.S.C. § 1343, when he devised a scheme to take unauthorized deductions from royalties and then send false check stubs showing zero deductions through the U.S. mail and/or wire communications. These acts allegedly occurred "on a monthly basis, since 2000." Robert Kane also allegedly committed the "predicate act" of violating 18 U.S.C. § 1957 by "depositing payments received from the purchasers of the natural gas . . . knowing the payments were derived from the unlawful activities of the wire fraud and/or mail fraud." (SAC ¶ 83.)

Count 6 is asserted by one named Plaintiff, Barbara Lucas, against Defendant Robert Kane pursuant to 18 U.S.C. § 1962(c) and (d). Again, the alleged "enterprise" consists of Wild West, White Hawk, and Purgatory. In his role as managing partner, Kane allegedly committed "predicate acts" of mail and wire fraud when he devised a scheme whereby he "made self-dealing sales to affiliated purchasers instead of calculating the proper royalties . . . based upon the sale of natural gas

to the ultimate end purchasers." (*Id.* ¶ 103.) Again, the mail fraud allegedly occurred via "false checks and check stubs, not showing the proper royalties." (*Id.*) Robert Kane also allegedly committed the "predicate act" of violating 18 U.S.C. § 1957 by "depositing payments received from the purchasers of the natural gas . . . knowing the payments were derived from the unlawful activities of the wire fraud and/or mail fraud." (*Id.* ¶ 105.)

Count 7 is asserted by several named Plaintiffs against Defendants Robert Kane, Pamela Brown, and Gary Brown pursuant to 18 U.S.C. § 1962(c) and (d). Pamela Brown is an employee of Wild West and White Hawk, but she also allegedly performs work for Bullseye Energy, Bullseye Operating, Gashoma, Purgatory, White Hawk, and New Cotton Valley. She markets the gas produced from Plaintiff's leases. Gary Brown, Pamela's husband, is also an employee of Wild West and White Hawk and performs work for the above-listed companies. In this count, the RICO "enterprise" is defined as Wild West, White Hawk, Bullseye Energy, Bullseye Operating, Gashoma, Purgatory, White Hawk, and New Cotton Valley. The enterprise is referred to as the "Kane Criminal Enterprise" or "Civil RICO Enterprise #2." These three Defendants allegedly committed the predicate acts of mail fraud and wire fraud by taking unauthorized royalty deductions and then sending false check stubs showing no deductions. These acts allegedly occurred "on a monthly basis, since 2000." Robert Kane and the Browns also allegedly committed the "predicate act" of violating 18 U.S.C. § 1957 by "depositing payments received from the purchasers of the natural gas . . . knowing the payments were derived from the unlawful activities of the wire fraud and/or mail fraud." (*Id.* ¶ 128.)

Count 8 is asserted by several named Plaintiffs against Defendants Louise Kane Roark, Ann Kane Seidman, Mark Kane, and CEP pursuant to only 18 U.S.C. § 1962(d). This count alleges that

these Plaintiffs, who are part owners of the relevant companies, conspired with Robert Kane and the Browns to take unauthorized deductions and underpay royalties by virtue of the sales to affiliated entities. This conspiracy has allegedly been ongoing since the year 2000 and continues today.

RICO provides a private cause of action for "[a]ny person injured in his business or property *by reason of* a violation of section 1962 of this chapter." 18 U.S.C. § 1964(c) (emphasis added). Section 1962 sets forth RICO's criminal provisions. 18 U.S.C. § 1962(a)-(d). Plaintiffs allege violation of § 1962(c), which makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate . . . commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." Plaintiffs also allege violation of § 1962(d), which makes it illegal "for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

To survive a Rule 12(b)(6) motion to dismiss a § 1962(c) claim, Plaintiffs must allege that the relevant Defendants "(1) participated in the conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Tal v. Hogan*, 453 F.3d 1244 (10th Cir. 2006). "[R]acketeering activity" is defined to include several predicate criminal acts, including the three alleged here – mail fraud, wire fraud, and engaging in monetary transactions in property derived from criminal activity. In addition to these elements, a plaintiff must also show proximate causation between the RICO predicate offense and the injury. *Hemi Group, LLC v. City of New York*, 559 U.S. 1, 8 (2010).

Defendants attack all four civil RICO counts on the same bases, arguing that: (1) the predicate act of violating § 1957 did not proximately cause Plaintiffs' injury; (2) the predicate act of wire fraud is not pled with particularity; (3) the predicate act of mail fraud is not pled with particularity; (4) the predicate act of mail fraud fails to state a claim for relief because Defendants

had no duty to disclose the unauthorized deductions or self-dealing; (5) the alleged predicate act of mail fraud did not proximately cause Plaintiffs' injury; and (6) all claims are barred by the statute of limitations.[13]  The Court addresses all six arguments below.[14]

### 1.    Predicate Act - § 1957

Defendants argued, in a footnote, that this predicate act did not proximately cause any injury to Plaintiffs.  (Resp. to Mot. to Amend 19 n.5.)  Plaintiffs did not discuss this footnote or otherwise suggest that the § 1957 violations saved their RICO claims, in the event the mail and wire fraud allegations failed.  Based on the lack of argument by Plaintiffs in relation to this predicate act, the Court considers it abandoned.  To the extent it is not abandoned, the Court finds that Plaintiffs have failed to show any causal link between Robert Kane's deposits of criminal proceeds and Plaintiffs' injuries of lost royalty payments.

---

[13]  Notably, Defendants did not argue that Plaintiffs failed to allege a "pattern" of racketeering activity, which is a common means of disposing of civil RICO claims at the Rule 12(b)(6) stage.  *See generally Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1025 (7th Cir. 1992) (explaining that many RICO plaintiffs try to "fit a square peg in a round hole by squeezing garden-variety business disputes into civil RICO actions" and that civil RICO claim requires "long-term criminal activity" rather than just one business deal gone sour).  Here, Plaintiffs allege the existence of long-term criminal activity committed against a multitude of royalty owners, rather than one fraudulent business deal between two entities.  *Cf. Tal*, 453 F.3d at 1267-68 (questioning whether "grant of one development contract acquired through misrepresentation of financial backing" constitutes a distinct threat of long-term racketeering activity).

[14]  Defendants argue that the § 1962(d) conspiracy claims fail due to the lack of any underlying RICO violation.  Thus, the Court's analysis of the § 1962(c) claims controls the outcome of any § 1962(d) claims.

### 2. Predicate Act - Wire Fraud (Particularity)

The particularity requirement of Rule 9(b) applies to claims of wire fraud and mail fraud and is especially important where the RICO claim provides the basis for federal jurisdiction. *Id.* The Tenth Circuit has explained:

> The threat of treble damages and injury to reputation which attend RICO actions justify requiring plaintiff to frame its pleading in such a way that will give the defendant . . . clear notice of the factual basis of the predicate acts. [T]his is particularly important in cases where the predicate fraud allegations provide the only link to federal jurisdiction.

*Cayman Exploration Corp. v. United Gas Pipeline Co.*, 873 F.2d 1357, 1362 (10th Cir. 1989). To be pled with particularity, the SAC must set forth the time, place, and contents of the false representation, the identity of the party making the false statements, and the consequences thereof. *Tal*, 453 F.3d at 1263. Plaintiffs must also identify the purpose of the mailing within the allegedly fraudulent scheme. *Id.*

Defendants argue that any RICO claims premised upon wire fraud fail based on the lack of any facts alleging any specific wire communications that occurred. Plaintiffs did not respond to this argument in any manner. If and to the extent the wire fraud allegations are not abandoned, the Court finds that Plaintiffs have failed to plead them with any particularity as required by Federal Rule of Civil Procedure 9(b). The SAC fails to set forth any specific instances of wire communications, such as phone calls or email, that are identified by date or time. The wire fraud allegations are conclusory and do not provide sufficient notice to Defendants. (*See, e.g.*, ¶ 103(B) ("This fraudulent skimming scheme was accomplished through the utilization of wire communications in interstate commerce (i.e., telephone calls, mobile and/or cellular telephone calls, text messages, facsimiles, e-mails, and/or the wire transfer of funds) that were done by Defendant Robert M. Kane.").) Due

to the stage of these proceedings, the Court will not permit further amendment to further specify the wire fraud allegations.

### 3.    Predicate Act - Mail Fraud (Particularity)

For similar reasons explained *supra* Part IV.B.1, the Court concludes that Plaintiffs have pled mail fraud with the requisite degree of particularity. The time, place, and contents of the false representation are the royalty statements sent to Plaintiffs every month from 2000-2015. The party making the statements is the lessee, which appears to be either Bullseye Energy or CEP. The purpose of the mailing within the fraudulent scheme was to mislead Plaintiffs into believing that no deductions were being taken from their royalty payments, when in fact deductions were being taken. This is sufficient to place Defendants on notice of the time, contents, and nature of the mail fraud.[15]

### 4.    Predicate Act - Mail Fraud (Elements)

To establish the predicate act of mail fraud, Plaintiffs must allege (1) the existence of a scheme to defraud*,* and (2) use of the United States mail for the purpose of executing the scheme. *Tal*, 453 F.3d at 1263. Defendants challenge Plaintiffs' allegations as to the first element – namely, the existence of a scheme to defraud. Defendants contend that Plaintiffs' allegations are limited to non-disclosures and that non-disclosures do not result in fraud absent a fiduciary duty.

The Court rejects Defendants' argument on two grounds. First, the Tenth Circuit has explained:

> A scheme to defraud is conduct intended or reasonably calculated to deceive persons of ordinary prudence or comprehension. The objective reference to persons of

---

[15]  It is less clear to the Court how the royalty statements helped facilitate or conceal that the sale was to an affiliated entity. This is particularly true since, beginning in 2004, the statements indicated that sales could be made to affiliated purchasers. However, the fraudulent statements related to the deductions are sufficient to allow this claim to proceed.

ordinary prudence or comprehension assists in determining whether the accused's conduct was calculated to deceive. Fraudulent intent is required. That said, a scheme to defraud by false representations may be accomplished by patently false statements or statements made with a reckless indifference as to their truth or falsity, *and deceitful concealment of material facts may constitute actual fraud.*

*United States v. Cochran*, 109 F.3d 660, 664-65 (10th Cir. 1997) (internal quotations, alterations and citations omitted, emphasis added). "A scheme to defraud focuses on the intended end result and affirmative misrepresentations are not essential . . . ." *Id.* at 664. The court also clarified that misleading omissions can form the basis of a mail or wire fraud claim even where there is no fiduciary duty. *See id.* ("Even apart from a fiduciary duty, in the context of certain transactions, a misleading omission is actionable as fraud if it is intended to induce a false belief and resulting action to the advantage of the misleader and the disadvantage of the misled."). Thus, the premise of Defendants' argument – that misleading omissions are only actionable where there is a fiduciary duty – does not appear to be the law of this circuit.

Second, the Court is not persuaded that Defendants' alleged conduct consisted solely of omissions. The allegations suggest that Defendants not only failed to disclose that impermissible deductions were being taken but misrepresented on the royalty statements that zero deductions were taken in a column designated as "Deduct." At least arguably, Defendants elected to speak but conveyed incorrect information. Of course, a record is necessary to determine what this column was intended to show and whether any misrepresentations occurred. But for purposes of a futility analysis, the Court finds that the allegations could potentially encompass affirmative misrepresentations as well as misleading omissions.

5.       **Causation**

Defendants next argue that the civil RICO claims are futile because Plaintiffs cannot show

they were harmed "by reason of" at least one RICO predicate act.  *See* 18 U.S.C. § 1964. In *Hemi*

*Group, LLC v. City of New York*, 559 U.S. 1, 9 (2010), the Supreme Court explained:

> [T]o state a claim under civil RICO, the plaintiff is required to show that a RICO
> predicate offense not only was a "but for" cause of his injury, but was the proximate
> cause as well. Proximate cause for RICO purposes . . . should be evaluated in light
> of its common-law foundations; proximate cause thus requires some direct relation
> between the injury asserted and the injurious conduct alleged.  A link that is "too
> remote," "purely contingent," or "indirec[t]" is insufficient.

(internal citations and quotations omitted).[16]  In deciding the issue of causation, the "focus is on the

directness of the relationship between the conduct and the harm," and not on the foreseeability of

the injury.  *See id.* at 12.

Generally, courts are reluctant to go beyond the "first step" of causation, meaning courts will

not find causation where there are several intervening events between the fraudulent predicate act

and the plaintiff's injury.  *See id.* at 10.  For example, in *Hemi Group*, the Court found no proximate

cause because there were too many breaks in the causation chain:

> The City's theory thus requires that we extend RICO liability to situations where the
> defendant's fraud on the third party (the State) has made it easier for a fourth party
> (the taxpayer) to cause harm to the plaintiff (the City). Indeed, the fourth-party
> taxpayers here only caused harm to the City in the first place if they decided not to
> pay taxes they were legally obligated to pay. Put simply, Hemi's obligation was to
> file the Jenkins Act reports with the State, not the City, and the City's harm was
> directly caused by the customers, not Hemi. We have never before stretched the
> causal chain of a RICO violation so far, and we decline to do so today.

---

[16]  Some courts have couched these causation requirements in terms of Article III
standing. *See Am. United Life Ins. v. Martinez*, 480 F.3d 1043, 1068 (11th Cir. 2007).  In
accordance with the most recent Supreme Court law, the Court analyzes the causation question
as a statutory requirement in § 1964(c) rather than as an Article III jurisdictional requirement.

*Id.* at 9; *see also Adell v. Macon Cnty. Greyhound Park, Inc.*, 785 F. Supp. 2d 1226, 1242-44 (M.D. Ala. 2011) (holding that gamblers seeking to recover losses they incurred while playing allegedly illegal electronic bingo machines could not show causation because, "[a]t bottom, Plaintiffs merely allege that 'but for' the RICO violations, there would have been no Victoryland and, thus, no electronic bingo machines for Plaintiffs to play").

Applying these standards, Plaintiffs have adequately pled a direct relationship between the fraudulent royalty statements and Plaintiffs' injuries. Robert Kane, acting for the alleged RICO enterprise, caused the fraudulent royalty remittance statements to be sent to Plaintiffs, and Plaintiffs relied upon these statements to show how royalties were derived. There are no intervening steps or actions by third parties between the fraudulent act and the injury, and these Plaintiffs are the proper (and indeed the only) people with incentive to sue for the fraud. *See Hemi Group*, 559 U.S. at 11-12 ("One consideration we have highlighted as relevant to the RICO 'direct relationship' requirement is whether better situated plaintiffs would have an incentive to sue.").

The Court rejects the argument that causation is lacking because the RICO allegations are merely "repackaged" contract claims. In some cases, a lessee simply might simply underpay royalties based on a good-faith dispute regarding what is owed under the law. In this case, however, Plaintiffs allegations go beyond a mere breach of contract. Plaintiffs allege that Robert Kane used White Hawk, Wild West, and Purgatory in a fraudulent scheme to take unauthorized deductions from Plaintiffs' royalties, thereby increasing profits of his overall criminal enterprise consisting of several companies, and then intentionally caused those deductions to be omitted from a column on the Plaintiffs' remittance statement. These allegations are distinguishable from cases in which a plaintiffs simply appended the word "fraudulent" to what was really a simple disagreement over

what amount was due under the leases. *Cf. LL & E Royalty Trust ex rel. Parsons v. Quantum Res. Mgmt., LLC*, No. 14-cv-13833, 2015 WL 4274987, at *4-5 (E.D. Mich. July 14, 2015) (dismissing RICO claim in oil and gas royalty underpayment case because the RICO claim boiled down to a disagreement over how net profits payments should have been computed and did not plead any "fraudulent acts" that occurred independently of the breach of contract).

Relying primarily on a Second Circuit case discussing the concepts of "transaction causation" and "loss causation," *see Moore v. PaineWebber, Inc.*, 189 F.3d 165, 171-72 (2d Cir. 1999), Defendants further argue that the royalty statements, even if fraudulent, did not cause Plaintiffs to enter into the leases (transaction causation) or cause their loss of royalties (loss causation). Defendants contend that the alleged financial losses would have occurred with or without the accompanying mailings.

The Court rejects this causation argument premised upon the *Moore* decision for two reasons. First, the Court is unaware of Supreme Court or Tenth Circuit law applying these two "causation" terms in the RICO context. In 2010, the Supreme Court explained RICO's causation requirements without mentioning these terms or any similar requirements. *See Hemi Group*, 559 U.S. at 9-12. Second, while the fraudulent mailings did not induce Plaintiffs to enter the original leases, they could plausibly be deemed a proximate cause of their economic injuries. The remittance statements were Defendants' only communications with Plaintiffs as to amounts owed. If indeed fraudulent in some manner, they potentially lulled Plaintiffs into believing no deductions were being taken. Making a false representation on paper in furtherance of a scheme to defraud falls under the gambit of mail fraud, even if the fraudulent scheme was also occurring separate and apart from the mailing. *See Suessenbach Family Ltd. P'ship v. Access Midstream Partners, L.P.*, Case No. 3:14-

1197, 2015 WL 1470863, at *12 (M.D. Pa. Mar. 31, 2015) (denying motion to dismiss RICO claim and rejecting identical causation argument made by the defendant, which had allegedly mailed fraudulent royalty statements ) (finding it sufficient that the plaintiffs alleged "that the predicate mailings transmitted the fraudulent royalty statements, as well as the royalty underpayments which were based on the statements" and that "these mailings were further designed to lull plaintiffs and other lessors into believing that no fraudulent scheme had occurred"); *see generally Liquid Air Corp. v. Rogers*, 834 F.2d 1297, 1304 -1305 (7th Cir. 1987) ("Each time an invoice was falsely prepared, it deprived Liquid Air of its entitlement to rent or replacement value.").

The Court further finds that Defendants' reliance on *South Chicago Bank v. Notaro*, No. 90-C-6357, 1991 WL 21185, at *4 (N.D. Ill. Feb. 12, 1991), is misplaced. In that case, the court found that a written statement revealing the alleged fraudulent behavior was not a proximate cause of the plaintiff's injuries because the plaintiff "did not act" on the basis of such mailing. Here, Plaintiffs allege to have relied on the accuracy of the statements to their detriment because the mailings lulled them into believing that no deductions were being taken. Such allegation is sufficient to survive a motion to dismiss.

### 6.     Statute of Limitations

Civil RICO damages claims are subject to a four-year statute of limitations. *Robert L. Kroenlein Trust ex rel. Alden v. Kirchhefer*, 764 F.3d 1268, 1274 (10th Cir. 2014). Although the Tenth Circuit declined to expressly adopt either the traditional "injury-occurrence" rule or the more lenient "injury-discovery" rule in civil RICO cases, it noted that "almost every other circuit currently applies some form of the injury-discovery rule to civil RICO claims." *Id.* at 1276. Therefore, the Court assumes the Tenth Circuit would also apply an injury-discovery rule.

Under the injury-discovery rule, the clock begins running from the earlier of when a plaintiff actually discovers his injury (actual notice) or when a reasonably diligent plaintiff would have discovered the injury (inquiry notice). *Id.* at 1279. "[A] plaintiff is on inquiry notice whenever circumstances exist that would lead a reasonable [plaintiff] of ordinary intelligence, through the exercise of reasonable due diligence, to discover his or her injury." *Id.* at 1280. "Once a plaintiff has inquiry notice of facts that would suggest to a reasonable person that he has been injured, the plaintiff has a duty to commence a diligent investigation concerning that injury." *Id.*

In applying these rules, a court must first identify the RICO "injury" in order to determine when a reasonably diligent person would have discovered it. A RICO "injury" occurs once a plaintiff has "knowledge of the harm resulting from the predicate act," not when a plaintiff discovers the harm *plus* the source of the harm. *Id.* at 1277-78. In *Kirchhefer*, for example, the statute of limitations began to run as soon as the plaintiff discovered accounting losses. The court rejected the plaintiff's argument that the statute began only when plaintiff traced the losses to a particular individual. *Id.* at 1279 ("[O]nce the [plaintiffs] were aware that one of several individuals . . . could be the cause of their injury, they had four years to determine the proper person against whom to file suit.").

In this case, the RICO "injury" or harm is lost royalty money flowing from the predicate acts of mail fraud committed via the royalty statements. As with the common-law fraud claim, Defendants argue that this injury should have been discovered as early as 2004 when Defendants began including the following language on the royalty statements:

> *Payment is made based upon all proceeds paid to the producer under a contract between the producer and its purchaser (including affiliated purchasers). The contract authorizes the deduction of all gathering, transportation, compression, and

similar charges incurred by the purchaser, directly or indirectly, from the amount
paid to the producer.

(Resp. to Mot. to Amend, Ex. 1-D.)  For the same reasons explained *supra* Part IV.B.2, the Court

finds that such language was not sufficient to trigger the statute of limitations.  Defendants are not

entitled to dismissal of the civil RICO claims under Rule 12(b)(6).

## V.     Conclusion

Plaintiffs' Motion to Amend Complaint to Add Parties and Assert Additional Claims (Doc.

96) is GRANTED.  Plaintiffs shall file the SAC in the exact form attached as Exhibit A to its motion

no later than three days from the date of entry of this Opinion and Order.  The Court has considered

and ruled upon all futility arguments raised in Defendants' response to the Motion to Amend, and

such rulings shall apply to the SAC once it is filed.  Thus, the SAC shall proceed as follows:

> Count 1: Against Bullseye Energy, CEP, and KRS&K
> Count 2: Dismissed With Prejudice as to all Defendants
> Count 3: Against Bullseye Energy, CEP, and KRS&K
> Count 4: Against Bullseye Energy, CEP, and KRS&K
> Count 5: Against Robert Kane
> Count 6: Against Robert Kane
> Count 7: Against Robert Kane, Pamela Brown, Gary Brown
> Count 8: Against Louise Roark, Anne Siedman, Mark Kane, and CEP[17]

Wild West, Purgatory, White Hawk, Redbird, and Gashoma shall be dismissed as parties from the

SAC upon its filing for the reasons set forth in this Opinion and Order.

Defendants' Motion to Decline Jurisdiction (Doc. 113) is DENIED as moot.  The Court has

permitted Plaintiffs to proceed on their RICO claims, and the Court has federal question jurisdiction

pursuant to 28 U.S.C. § 1331.

---

[17] For Counts 5-8, the only remaining predicate act is mail fraud.

The parties are ordered to meet and confer at the earliest practicable time and submit a Joint Report to the Court no later than thirty days from the date of this Opinion and Order. The Joint Report shall:

1.      Propose a schedule for proceeding with the SAC.

2.      Propose a schedule for proceeding with Case No. 15-CV-455-TCK-TLW, if Plaintiffs intend to pursue that matter in light of the Court's rulings. This schedule shall include deadlines for any motions to consolidate.

3.      State whether any pending motions are moot or will be moot upon the Court's entry of a new schedule.

4.      State whether the parties request rulings on any currently pending motions prior to proceeding.

SO ORDERED this 14th day of October, 2015.

*Terence C Kern*

**TERENCE C. KERN**
**UNITED STATES DISTRICT JUDGE**