# United States District Court
## for the Northern District of Oklahoma

---

Case No. 12-cv-411-JDR-CDL

CONSOLIDATED WITH

Case No. 15-cv-455-JDR-JFJ

---

KEVIN L. JETER; JOE A. JETER; BARBARA LUCAS; JAMES H. MILLER; SHARON RIGSBY MILLER; LARRY SMITH; JANICE SUE PARKER, *individually and on behalf of all similarly situated persons*,

*Plaintiffs*,

*and*

KEVIN L. JETER; JOE A. JETER; BARBARA LUCAS; JAMES H. MILLER; SHARON RIGSBY MILLER; LARRY SMITH; JANICE SUE PARKER; JAMES D. ENLOE; CAROLYN R. ENLOE; SCOTT BAILY, *individually and on behalf of all similarly situated persons*,

*Consolidated Plaintiffs,*

*versus*

BULLSEYE ENERGY, L.L.C.; KRS&K; CEP MID-CONTINENT, L.L.C.; ROBERT M. KANE; LOUISE KANE ROARK; ANN KANE SEIDMAN; MARK KANE; PAMELA BROWN; GARY BROWN,

*Defendants/Consolidated Defendants*.

---

## OPINION AND ORDER

---

Plaintiffs are royalty owners of gas wells located within the Northern District of Oklahoma. They allege that the Defendants breached implied covenants, contracts, statutory obligations, and fiduciary duties owed to Plaintiffs; schemed to defraud Plaintiffs; and violated the Racketeer Influenced and Corrupt Organizations Act through acts of mail fraud and wire

fraud directed at Plaintiffs. Dkt. 154. Plaintiffs filed a motion asking this Court to certify three separate classes. Dkt. 376. Defendants, who oppose the motion, have filed a motion to strike Plaintiff's proposed class definitions. Dkt. 388. For the reasons set forth herein, Plaintiffs' Motion for Class Certification is DENIED.

I.

During its twelve-year pendency, this case has been governed by multiple complaints. First, in July 2012, Plaintiffs Kevin Jeter, Joe Jeter, Barbara Lucas, James Miller, and Sharon Rigsby Miller filed a complaint identifying the following class:

> All non-excluded persons and entities who, as of the date of filing of this Complaint, are or were royalty owners in producing gas wells located in the Northern District of Oklahoma where one or more of the Defendants is or was a lessee and/or operator and/or working-interest owner under the Leases, and/or where the Defendants control or controlled the operators, working-interest owners, and/or lessees under the Leases. The Class does not include overriding royalty owners or other owners who derive their interest through the oil and gas lessee. The Class does not include any wells located on federal, state, county, municipal, military, or Indian lands in which one or more Defendants own any interests.

> The persons or entities excluded from the Class are persons or entities who are not citizens of any State on the date of filing this Complaint, persons or entities who have settled or released their royalty-related claims with any of the Defendants as of the date of filing of this Complaint, any Indian Tribe or Nation, federal, state and local governments, including agencies, departments, or instrumentalities of the United States of America and State of Oklahoma (including public trusts, counties, and municipalities), publicly traded oil and gas exploration companies and their affiliates, and persons or entities that Plaintiffs' counsel are prohibited from representing under the Oklahoma Rules of Professional Conduct.

Dkt. 2 at 7.[1] A first amended complaint retained this definition but added language excluding from the class those "persons or entities who have entered into Leases with any of the Defendants which contain specialized provisions allowing the Defendants to subtract expenses from royalties that would otherwise be contrary to Oklahoma law." Dkt. 33 at 8.

A separate action alleging RICO violations was initiated in August 2015. *See Jeter v. CEP Mid-Continent, LLC*, Case No. 15-cv-455 (hereinafter *Jeter II*), Dkt. 2. The complaint in *Jeter II* set forth a class definition that was substantially identical to the definition proposed in the first amended complaint in this case, apart from a footnote indicating Plaintiffs might propose sub-classes "for class members who have leases allowing for deduction of costs and have been overcharged for these costs." *Jeter II*, Dkt. 2 at 10, n.1.

Shortly thereafter, Plaintiffs filed a second amended complaint in this action. Dkt. 154. The class definition, like the definition in *Jeter II*, excluded from the proposed class those individuals who had "entered into Leases with any of the Defendants which contain specialized contractual provisions allowing Defendants to subtract expenses/costs from royalties" and included a footnote recognizing the potential for sub-classes, including sub-classes for those class members whose leases permitted the deduction of costs. *Id.* at 11-12.[2]

The Court consolidated this case with *Jeter II* in January 2016. Dkt. 171. The complaints operative in 2015 remained in place for over six years while the parties engaged in settlement negotiations, addressed disputes between the settling and non-settling class members, sought and were denied

---

[1] All citations utilize CMECF pagination.

[2] The revised definition removed the phrase "that would otherwise be contrary to Oklahoma law" from the paragraph excluding "persons or entities who have entered into Leases…which contain specialized contractual provisions" from the class.

Case No. 12-cv-411

approval of a class-wide settlement, and stayed the case with respect to defendant Bullseye Energy, LLC, following the initiation of a bankruptcy proceeding by that defendant. Dkt. Nos. 233, 234, 244, 249, 262, 296, 324, 367.

In the fall of 2022, Plaintiffs moved to certify the following three classes:

**The Gross Proceeds Class**

All persons (1) who own or owned minerals subject to an Oil and Gas lease from July 24, 2007 to the present under which they received royalty on the sale and disposition of gas attributable to Defendants' and Defendants' affiliated entities' interest in properties in the Northern District of Oklahoma; and (2) whose royalty was reduced by Defendants for expenses charged against the gross sales proceeds.

**The Net Proceeds Class**

All persons (1) who own or owned minerals subject to an Oil and Gas lease with a net proceeds royalty clause from July 24, 2007 to the present under which they received royalty on the sale and disposition of gas attributable to Defendants' and Defendants' affiliated entities' interest in properties in the Northern District of Oklahoma; and (2) Royalty Owners' royalty was reduced by Defendants for expenses charged against the gross sales proceeds.

**The RICO Class**

All persons in the Gross Proceeds Class and Net Proceeds Sub-Class who received royalty statements on or after July 24, 2008 with a "0.00" in the deducts column.

Dkt. 376 at 2-3. Defendants opposed the motion to certify and filed a motion to strike the proposed class definitions. Dkt. 388. Briefing on both motions

Case No. 12-cv-411

is now complete, and the issues presented in the motions are ripe for review.[3]

## II.

Defendants ask this Court to strike the class definitions in the motion for certification. Dkt. 388. Defendants argue that, since the first amended complaint was filed in 2013, the proposed class definitions have consistently excluded persons or entities whose oil and gas leases permit the deduction of costs and expenses. Dkt. 388 at 3-6; *id.* at 3 (quoting Dkt. 33 at ¶ 33). Defendants contend that Plaintiffs' motion to certify a Net Proceeds Class (and, by extension, a RICO class that incorporates members of the Net Proceeds Class) constitutes an impermissible attempt to expand the class definition beyond the scope of the operative pleadings. *Id.* at 6. Defendants argue that any expansion of the proposed class at this stage of the proceedings is procedurally improper and necessarily prejudicial. *Id.* at 6-7.

In response, Plaintiffs argue that Defendants' motion is untimely and unsupportable under either Rule 12 or Rule 23(d)(1)(D) of the Federal Rules of Civil Procedure. Dkt. 390 at 5-6. They further contend that the second amended complaint implicitly includes the Net Proceeds Class, as evidenced by the footnote suggesting that Plaintiffs might propose subclasses for members "who have leases allowing for the deduction of costs." *Id.* at 7 (citations and quotation marks omitted). Finally, they argue that Defendants have not established, and cannot establish, that they would be prejudiced by an order adopting the proposed class definitions. *Id.* at 9-11.

---

[3] Defendants maintain that the Court should hold a full evidentiary hearing on Plaintiffs' motion for class certification. Dkt. 416. Plaintiffs disagree, arguing that while evidentiary hearings are sometimes helpful, they are not necessary in cases such as this one. Dkt. 417 at 2-3. The Court concludes that an evidentiary hearing is not necessary to resolve the pending motions.

Case No. 12-cv-411

The Court begins with Plaintiffs' procedural arguments. Plaintiffs correctly argue that a Rule 12 motion to strike would be untimely at this juncture. *See* Fed. R. Civ. P. 12(f)(2). They also correctly assert that Defendants have not argued—or even attempted to argue—that the operative pleadings should be modified pursuant to Rule 23. Dkt. 390 at 5. But Plaintiffs' procedural arguments are based on a fundamental misunderstanding of what Defendants are attempting to do: Defendants are not requesting a modification of the ***operative pleadings*** under Rule 12 or Rule 23. Instead, Plaintiffs are asking the Court to strike or deny certification of the class proposed in ***Plaintiffs' motion for class certification*** on the grounds that the motion is not aligned with the pleadings that govern this case. *See* Dkt. 388 at 8 (requesting that the "proposed class definition set forth in Plaintiffs' Motion...be stricken and/or denied"). The rules cited by Plaintiffs apply to pleadings, rather than motions. Fed. R. Civ. P. 12(f); Fed. R. Civ. P. 23(d)(1)(D). Those rules do not govern Defendants' request for relief. *See* Fed. R. Civ. P. 7 (distinguishing between "Pleadings" and "Motions and Other Papers").[4]

How, then, should the Court address Defendants' motion to strike? One option would be to simply deny the motion on the grounds that it does not technically fall within the scope of Rule 12 or Rule 23. But such a hidebound approach seems inconsistent with the overarching directive that the Federal Rules "be construed, administered and employed...to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1. The just resolution of disputes is not achieved by disregarding a motion on technical grounds, particularly where the motion is fully briefed and other courts have entertained—and granted—similar motions. *E.g., Krikorian On Behalf of TPS Parking Mgmt., LLC 401(k) Plan*

---

[4] *See also Ysais v. New Mexico Jud. Standard Comm'n*, 616 F. Supp. 2d 1176, 1184 (D.N.M. 2009) (recognizing that, generally speaking, "motions, briefs, and memoranda may not be attacked by a motion to strike").

Case No. 12-cv-411

*v. Great-W. Life & Annuity Ins. Co.*, No. 16-cv-00094-REB-SKC, 2018 WL 4360539, at *5 (D. Colo. Sept. 13, 2018) (granting motion to strike the expanded class definition to the extent the definition "includes plaintiffs and claims which are not the subject of the allegations in the complaint").

This Court has inherent authority to manage its docket to effect orderly and expeditious results. *See Stenson v. Edmonds*, 86 F.4th 870, 876 (10th Cir. 2023). Having reviewed Defendants' motion and the associated briefs, the Court concludes that the interest of resolving this case justly and efficiently would be best served by construing Defendants' motion as a brief in opposition to Plaintiffs' motion for class certification. The motion raises issues that pertain to the merits of the certification issue. *E.g., Phelps v. Parsons Tech. Support, Inc.*, No. CIV. 2:09-0327-JMS, 2010 WL 4386918, at *3 (S.D. Ind. Oct. 29, 2010) (agreeing that the proposed class was broader than the definition set forth in the operative pleading, and declining to adopt the broader definition); *Richard v. Oak Tree Grp., Inc.*, No. 1:06-cv-362, 2008 WL 421074, at *1 (W.D. Mich. Feb. 12, 2008) (holding that the motion to certify failed "because the class that plaintiffs [sought] to certify [was] different from the class as defined in the first amended complaint"). Further, both sides have had an opportunity to address the arguments raised by Defendants. *See* Dkt. Nos. 388, 390, 392. Under these circumstances, the Court concludes it is proper to consider the arguments raised in Defendants' motion in the context of the class certification question.

The Court now turns to the question raised in Defendants' briefing: Should the Court certify the Gross Proceeds Class, the Net Proceeds Class, and the RICO Class as defined in Plaintiffs' Motion to Certify? The Court answers that question in the negative.

When this case was filed over a decade ago, Plaintiffs alleged that the prospective class consisted of non-excluded "royalty owners in producing gas wells located in the Northern District of Oklahoma where one or more of the Defendants is or was a lessee and/or operator and/or working-

Case No. 12-cv-411

interest owner under the Leases, and/or where the Defendants control or controlled the operators, working-interest owners, and/or lessees under the Leases." Dkt. 2 at 7. Soon thereafter,[5] Plaintiffs amended the class definition to specifically exclude individuals whose leases allow the deduction of expenses. Dkt. 33 at 8. A slight modification to the exclusionary provision was made in 2015; that provision, which was set forth nearly nine years ago, remains in place to this day. Dkt. 154 at 11-12.

Plaintiffs now seek to certify not one but three classes, two of which include or incorporate by reference those who "own or owned minerals subject to an Oil and Gas lease with a net proceeds royalty clause." Dkt. 376 at 2 (defining the Net Proceeds Class); *id.* at 3 (incorporating members of the Net Proceeds Class). But individuals whose leases contain net proceeds royalty clauses would, necessarily, be members "who have entered into Leases…which contain specialized contractual provisions allowing Defendants to subtract expenses/costs from royalties" and who are therefore excluded under the operative complaint. Dkt. 154 at 11-12. It is impossible to certify a "net proceeds class" when the very members of that class are excluded under the class proposed by the operative pleading. The class definitions in Plaintiffs' motion are, by their plain language, broader than those set forth in the complaint.

In arguing otherwise, Plaintiffs rely on a footnote in their second amended complaint. Plaintiffs claim that, because the footnote contemplates potential "sub-classes…for class members who have leases allowing for deduction of costs and have been overcharged for these costs" [Dkt. 154 at 11-12], the pleading "alert[ed] Defendants to the net proceeds class."

---

[5] Although the amended complaint was filed over a year after its original counterpart, the amendment was made early in the proceedings: Shortly after service was returned, the case was stayed pending resolution of a case before the Court of Appeals for the Tenth Circuit. See Dkt. Nos. 13, 25. When the stay was lifted on October 18, 2013, the Plaintiffs immediately filed their amended complaint. Dkt. Nos. 32, 33.

Case No. 12-cv-411

Dkt. 390 at 3. The Court disagrees. A subclass is created by dividing ***an existing class*** into one or more groups. *See* Federal Rule of Civil Procedure 23(c)(5) (recognizing that "a class may be divided into subclasses that are each treated as a class under this rule"); *Naylor Farms v. Chaparral Energy, LLC*, 923 F.3d 779, 790 (10th Cir. 2019) (recognizing that a court can "divide the class into subclasses"). It is not a means of expanding a class.

To the effect the footnote in the second amended complaint has any impact, it reserves Plaintiffs' right to create subgroups of people who, inter alia, (a) "are or were royalty owners in producing gas wells located in the Northern District of Oklahoma" ***and*** (b) who had leases with Defendants that ***did not contain*** "specialized contractual provisions allowing Defendants to subtract expenses/costs from royalties." Dkt. 154 at 11-12. That is not what Plaintiffs' proposed class definitions accomplish. Instead, Plaintiffs seek certification of a Gross Proceeds Class, whose members' leases allegedly ***do not*** permit Defendants to reduce their royalties based on certain expenses, and a Net Proceeds Class, whose leases ***necessarily*** permit Defendants to reduce their royalties for expenses charged against gross sales.[6] The former falls squarely within the definition set forth in the second amended complaint; the latter falls wholly outside of it. The Court cannot envision, and Plaintiffs have not identified, a single net proceeds lease that does not "contain specialized contractual provisions allowing Defendants to subtract expenses/costs from royalties" as required by the operative pleading. Dkt. 154 at 11-12. Absent a showing that such a lease exists, Plaintiffs' proposed Net Proceeds Class necessarily expands the scope of the class identified in the operative pleading.

Plaintiffs' attempt to broaden the scope of the class is impermissible. *See Castillo v. P & R Enterprises, Inc.*, 517 F. Supp. 2d 440, 446 (D.D.C.

---

[6] *See* Dkt. 377 at 28-29 (Plaintiff's brief in support of motion) (arguing that the leases with gross-proceeds provisions do not permit deductions of expenses or fees, while acknowledging that leases with net proceeds provisions "expressly permit deductions").

Case No. 12-cv-411

2007) (recognizing that plaintiffs "cannot in the instant motion expand the scope of the proposed class beyond that which is contained in their Complaint"). It is essential that a plaintiff properly and clearly define the proposed class at the outset, as the complaint governs the scope of an action. *E.g., Sandlin v. Grand Isle Shipyard, Inc.*, No. cv-17-10083, 2018 WL 2065595, at *3 (E.D. La. May 3, 2018) (recognizing that a pleading should provide fair notice of the scope of the claim and rejecting a proposed class definition that fell outside the scope). In the context of a class action, the complaint informs the defendant of the type of claims that can be brought against it, identifies the individuals who are entitled to relief and who will be bound by the final judgment, and permits the defendant to assess the nature and scope of the risk to which it is exposed.[7] To allow Plaintiffs to expand the scope of those to be bound by the final judgment now, more than a decade after this litigation commenced, would necessarily prejudice Defendants in this case.[8] *See Naylor Farms*, 2009 WL 8572026, at *3 (concluding

---

[7] *See Naylor Farms v. Anadarko OGC Co.*, No. CIV-08-668-R, 2009 WL 8572026, at *3 (W.D. Okla. Aug. 26, 2009); *Johnson v. Riddle*, No. 2:98-CV-599 TS, 2007 WL 528719, at *4 (D. Utah Feb. 15, 2007) (recognizing that the complaint, rather than the motion for class certification, notifies the defendants "not only of the substantive claims being brought against them, but also of the number and generic identities of the potential plaintiffs who may participate in the judgment").

[8] Plaintiffs argue that Defendants are not prejudiced by the expansion because they have attempted to settle a class that includes net proceeds leases and engaged in discovery regarding net proceeds leases. Dkt. 390 at 9-12. The Court disagrees. It is well-established that parties may cast a broad net when seeking discovery. *See* Fed. R. Civ. P. 26(b)(1) (recognizing that evidence need not be admissible to be discoverable). And it is common practice for settling parties to resolve all potential claims against them, rather than settling only the claims specifically identified in the complaint. *E.g., Thede v. Norfolk S. Corp.*, No. 91-1079, 1992 WL 14943, at *4, n.1 (10th Cir. 1992) (referencing release that was broader than the claims set forth in the lawsuit). The fact that the parties made broad discovery requests or sought to achieve a global settlement does not refute the fact that the Defendants would be harmed by an expansion of the scope of the proposed class near-

Case No. 12-cv-411

that amendment to expand the class "would be unfair to [the defendants], who [had] been defending [the] action for more than four years based on the second amended definition").

The complaint sets the bounds for the lawsuit, and the plaintiff is the master of it. *See Webster v. Reprod. Health Servs.*, 492 U.S. 490, 512 (1989) (recognizing that plaintiffs "are masters of their complaints" at all stages of litigation); *Hatch v. Boulder Town Council*, 471 F.3d 1142, 1150 (10th Cir. 2006) (recognizing that the complaint "frames the scope of litigation, establishing a transactional nexus into which facts and claims are fitted or excluded for purposes of claim preclusion"). Where, as here, the operative complaint excludes certain individuals from a class, those individuals cannot be inserted into the action by means of a motion for class certification. Plaintiffs' Motion to Certify impermissibly attempts to expand the scope of the class identified in the operative pleading. That attempt must fail. *Castillo*, 517 F. Supp. 2d at 446. Accordingly, Plaintiffs' motion to certify the Net Proceeds Class and a RICO Class incorporating members of the Net Proceeds Class is DENIED.

### III.

The Court now considers whether the Gross Proceeds Class should be certified. A plaintiff seeking class certification must establish that the proposed class meets all four requirements set forth in Federal Rule of Civil Procedure 23, subparagraph (a), and at least one of the three alternative requirements in subparagraph (b) of that rule. *See* Fed. R. Civ. P. 23 (a) & (b); *Reed v. Bowen*, 849 F.2d 1307, 1309 (10th Cir.1988) (recognizing that the party seeking certification has the burden of demonstrating the requirements for class certification are satisfied).

---

ly a decade after this lawsuit was filed. *E.g., Johnson*, 2007 WL 528719, at *4 (recognizing that broadening the class would have the effect of introducing time-barred claims).

Case No. 12-cv-411

When evaluating whether class certification is proper, this Court must undertake a "rigorous analysis" of the Rule 23 factors. *See Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc.*, 725 F.3d 1213, 1217, 1219 (10th Cir. 2013). Although this Court should accept the allegations of the operative pleading as true, it need not blindly rely on conclusory allegations, and may consider the legal and factual issues presented by the complaint. *DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1194 (10th Cir. 2010).

Federal Rule of Civil Procedure 23(a) sets forth four requirements for certification: First, the class must be so numerous that joinder of all members is impracticable; second, the class members' claims must share common questions of law or fact; third, the claims or defenses of the class representatives must be typical of the claims and defenses of the class; and fourth, the class representatives must adequately represent the interests of the class members. Fed. R. Civ. P. 23(a). Plaintiffs claim that the Gross Proceeds Class satisfies not only these requirements, but also the requirements set forth in Rule 23(b)(3), which permits a class to be certified where "questions of law or fact common to class members predominate over any questions affecting only individual members, and…a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Defendants concede that Plaintiffs have established the numerosity requirement,[9] but raise numerous factual and legal issues that, according to Defendants, preclude a finding of commonality, typicality, adequacy, predominance, and superiority.

Many of the arguments raised by Defendants concerning adequacy and typicality apply with equal force to the question of whether the class members' claims share common issues of fact and law. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 n. 5 (2011) (recognizing that the commonality and typicality requirements "tend to merge" with each other and the adequacy-of-representation requirement (quoting *General Telephone Co. of*

---

[9] Dkt. 389 at 13.

Case No. 12-cv-411

*Southwest v. Falcon*, 457 U.S. 147, 157–158, n. 13 (1982))). The commonality element, in turn, is often subsumed by "the more stringent Rule 23(b)(3) requirement that questions common to the class 'predominate over' other questions." *Brayman v. KeyPoint Gov't Sol'ns, Inc.*, 83 F.4th 823, 838 (10th Cir. 2023) (citation and quotation marks omitted). Accordingly, this Court begins with the question of whether, in view of the evidence presented by the parties, questions common to the class predominate over individual ones.

### A.   Whether Common Questions Predominate

Plaintiffs claim the following questions are common to members of the Gross Proceeds Class and will predominate over individual issues: (1) whether gas produced from Plaintiffs' wells was marketable at the wellhead; (2) whether Defendants' sales to affiliated entities can be used to set royalty prices; and (3) whether the leases waived Defendants' implied duty to market class gas. Dkt. 377 at 16-17, 24-28.

The Court notes, at the outset, that the mere fact that a question ***is common to*** all class members does not necessarily mean that the question ***can be resolved*** on a class-wide basis. *See Wal-Mart Stores, Inc.*, 564 U.S. at 350 (stating that what matters "is not the raising of common 'questions'— even in droves—but rather, the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation" (citation, quotation marks, and emphasis omitted)). To support certification, the common question "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each of the claims in one stroke." *Id.*

The difference is significant, particularly with respect to the first common question identified by Plaintiffs—whether the gas produced by Plaintiffs' wells was marketable at the wellhead. Dkt. 377 at 16. Plaintiffs

Case No. 12-cv-411

suggest that this question can be determined by reference to a lease chart and expert testimony. *Id.* at 17-19. But, in reaching this conclusion, Plaintiffs assume that the marketability of the class members' gas is subject to common proof of Defendants' conduct. *See id.* at 19 (claiming that "all evidence on this core issue will focus on Defendants' conduct"). That assumption is not supported by Oklahoma law or the facts of this case.

This Court recently set forth an overview of Oklahoma law as it pertains to gross-proceeds leases.[10] *Kunneman Properties, LLC v. Marathon Oil Company*, No. 17-cv-456-GKF-JFJ, 2022 WL 1766925 (N.D. Okla. Mar. 31, 2022). Briefly stated, Oklahoma law imposes a duty of obtaining a marketable product on the lessee, who will ordinarily bear the cost of putting gas in a place and condition where it can be sold. *Id.* at *3 (citations omitted). Thus, a lessee ordinarily may not deduct costs associated with transportation, compression, dehydration, and blending from a royalty payment when those costs are necessary to creating a marketable product. *Id.*

A portion of processing costs **may**, however, be deducted from the royalties paid under a gross-proceeds lease so long as the gas was already marketable at the time it was processed, the processing costs were reasona-

---

[10] The term "gross-proceeds lease" is not a precisely defined term, although many courts use it to reflect the legal landscape in Oklahoma. *E.g., Pummill v. Hancock Expl. LLC*, 2018 OK CIV APP 48, ¶ 27, 419 P.3d 1268, 1276. Generally speaking, unless a contract provides otherwise, costs associated with gathering, transporting, compressing, and dehydrating gas may not be deducted from a royalty payment if those costs are necessary to putting gas in marketable condition; a proportionate share of those costs **may** be deducted, however, when they increase the value of an already marketable product and are reasonable and proportionate to the increased royalty revenues resulting from the treatment. *Mittelstaedt v. Santa Fe Minerals, Inc.*, 1998 OK 7, ¶¶ 27, 30, 954 P.2d 1203, 1209-10. The term "gross-proceeds lease" is used to refer to those leases that follow this general rule, while the term "net-proceeds lease" is used to refer to leases permitting the deduction of certain costs, reflecting a departure from the default position. *Pummill*, 2018 OK CIV APP 48, ¶ 26, 419 P.3d at 1275 (recognizing that the general rule is followed "unless the lease provides otherwise").

Case No. 12-cv-411

ble, and the royalty revenues increased in proportion with the costs as-
sessed. *Id.* Consequently, in the context of a gross-proceeds lease, the ques-
tion of whether costs may be deducted necessitates an individualized as-
sessment of whether the gas was already marketable, whether the post-
marketability costs were reasonable, and whether revenues were increased
proportionately to those costs. *Id.* at *3-*4; *see also Mittelstaedt,* 1998 OK 7,
¶ 2, 954 P.2d at 1205 (recognizing that a portion of reasonable costs that
proportionately enhanced the value of an already marketable product may
be deducted from a royalty payment, and stating that, "in some cases a roy-
alty interest may be burdened with post-production costs, and in other cases
it may not").[11]

Plaintiffs argue that an individual assessment is not always required,
citing *Naylor Farms*, 923 F.3d 779, in support of the proposition that the
marketability of gas at the wellhead is a question that can be established by
common proof. Dkt. 377 at 19. But the facts of *Naylor Farms* were unique. In
that case, the plaintiffs had demonstrated that "all the gas at issue required
at least one…service to become marketable." *Naylor Farms*, 923 F.3d at
790. In fact, in the proceedings before the district court, the plaintiffs de-
fined the class to "exclude[] wells whose gas does not undergo any gather-
ing, compression, dehydration, treatment, or processing before entering an
interstate pipeline." *Naylor Farms, Inc. v. Chaparral Energy, LLC*, No. CIV-
11-0634-HE, 2017 WL 187542, at *6 (W.D. Okla. Jan. 17, 2017), aff'd, 923
F.3d 779 (10th Cir. 2019). It was possible to treat the question of breach on a
class-wide basis in *Naylor Farms* because the plaintiffs had demonstrated

---

[11] *See also Strack v. Cont'l Res., Inc.*, 2017 OK CIV APP 53, ¶ 32, 405 P.3d 131, 140
(denying class certification where a "highly individualized and fact-intensive review of
each Class Members' claim would be necessary to determine if Continental underpaid oil
or gas royalties"); *Whisenant v. Strat Land Expl. Co.*, 2018 OK CIV APP 65, ¶ 23, 429
P.3d 703, 712 (concluding that, even if royalties were paid using a common method, that
common fact failed to resolve the individual question of liability).

Case No. 12-cv-411

that ***none*** of the gas at issue was marketable at the wellhead. *Naylor Farms*, 923 F.3d at 792.

Unlike the plaintiffs in *Naylor Farms*, the Plaintiffs in this case have not demonstrated that all the wells at issue may be treated collectively for purposes of determining marketability.[12] To the contrary, the evidence of record suggests that some of the wells at issue in this case do produce, or have produced, marketable gas. Dkt. 389-15 at 9 (concluding that, based upon provided gas quality information, "the gas produced from most of the wells involved is quite dry, pipeline-quality gas," and noting that some of the wells had "house taps" to permit direct use).[13]

Plaintiffs have not refuted this evidence, nor have they taken steps to eliminate the wells producing marketable gas from consideration as the plaintiffs did in *Naylor Farms*.[14] The facts of this case therefore fail to support Plaintiffs' suggestion that the question of marketability at the wellhead

---

[12] Plaintiffs point to their expert's opinion to support the contention that all the class members' gas required some level of treatment to be marketable. Dkt. 377 at 8. But their expert did not conduct any individualized analysis of the gas at issue in reaching this conclusion. *See* Dkt. 377-8 at 4 (acknowledging that the expert's opinions do not rely on evidence from individual royalty owners); *id.* at 23-24 (listing materials relied upon). Instead, the expert assumed that, because the gas was blended and the royalty was calculated after the midstream company performed its services, those services must have been required for all class members. *Id.* at 8-10. The expert did not opine, or purport to opine, as to whether the raw gas produced by the class members' wells was otherwise marketable at the wellhead. *Id.* at 9 (concluding that the gas would require processing "for delivery into the high-pressure pipeline market").

[13] *See also* Dkt. 389-16 at 12, 23-24 (opining that the class members' wells would generally produce gas that is marketable at the well, and noting the existence of house taps and the acceptance of unprocessed natural gas by the Southern Star transmission system for use in heating homes in Bartlesville, Oklahoma); Dkt. 389-21 (opining that the natural gas "may be marketable" at the class members' wells, but that individual analysis would be necessary).

[14] *Naylor Farms, Inc.*, 2017 WL 187542, at *6.

Case No. 12-cv-411

is susceptible to class-wide proof; instead, the facts demonstrate that the question of whether each member's gas is marketable will need to be resolved on an individualized basis. The individualized nature of this inquiry weighs against a finding of predominance. *See Whisenant,* 2018 OK CIV APP 65, ¶ 17, 429 P.3d at 710 (concluding class certification was not proper where the "determinations of the quality of gas and other facts pertinent to each well" were not "susceptible to generalized proof"); *Strack*, 2017 OK CIV APP 53, ¶¶ 31-34, 405 P.3d at 140 (concluding the trial court erred in granting certification where the "question of where and when particular gas is marketable" was not settled and a "highly individualized and fact-intensive review" would be necessary to assess whether royalties had been underpaid).

The Court next considers the third[15] allegedly common question proposed by Plaintiffs: Whether Defendants waived their implied duty to market the class members' gas under the gross-proceeds leases.[16] Several courts have grappled with whether the issue of waiver of an implied duty to market can be resolved on a class-wide basis. For example, in *Naylor Farms*, the Court of Appeals for the Tenth Circuit affirmed the class-wide resolution of this issue, but noted that the district court had taken the critical step of "narrow[ing] the class to include only those royalty owners whose leases contain clauses" that had been held not to negate that duty. 923 F.3d at 790, 795-96 (noting that the district court "limit[ed] the class to leases containing a *Mittelstaedt* Clause"). This Court, in contrast, has declined to find a common question where the plaintiffs failed to create a generally accurate lease chart and the variations in the identified lease language would require

---

[15] The Court addresses the second purportedly common question *infra* at 19-20.

[16] *E.g., Naylor Farms*, 923 F.3d at 783 (referencing the class members' argument that the defendant attempted to circumvent its duty of marketability by entering into sham midstream contracts with companies that did not actually pay for the gas at the time of sale).

litigation of "each variation." *Kunneman Properties*, 2022 WL 1766925, at *9.

Although *Naylor Farms* and *Kunneman Properties* reach different outcomes, they stand for a shared proposition: To establish that waiver can be determined on a class-wide basis, the party seeking class certification must show that an individualized lease assessment is not necessary. The party may make this showing by producing a generally accurate lease chart demonstrating that the leases in the proposed class contain language that is materially similar. *Naylor Farms*, 923 F.3d at 796; *Kunneman*, 2022 WL 1766925, at *9.

This Court has reviewed the lease chart prepared by Plaintiffs and finds it is insufficient to establish that the question of waiver can be resolved on a class-wide basis. First, even where net proceeds leases are excluded, the leases fall into no less than seven broad categories. Dkt. 380 (classifying leases into the following categories: Gross Proceeds, *Pummill-Parrish*, unable to determine, *Mittelstaedt*, *Wood v. TXO*, *Pummill-Pummill*, and no category assigned). The vast majority of these leases are classified as *Mittelstaedt* leases, but the rationale for the classification is not always apparent; the Court sees little difference between, for example, the language excerpted from the Wyly lease (Bates No. 37,133-37,134) and the immediately adjacent Hastings lease (Bates No. 37,135-37,136). *Id.* at 2. Yet one of these leases is classified as a *Mittelstaedt* lease, while the other is classified as a *Wood v. TXO* lease. *Id.*[17] Some of the so-called *Mittelstaedt* leases contain identical

---

[17] The primary difference appears to be the inclusion of a personal use clause in the Hastings lease. Dkt. 380 at 2. But that same clause is not present in the Coates lease, Bates No. 37,147-37,138, which, like the Hastings lease, is classified as a *Wood v. TXO* lease. *Id.* at 1. Furthermore, although both the Hastings and Coates leases are classified as *Wood v. TXO* leases, only one of them contains certain language present in the Wyly lease. *Compare id.* at 2 (including "next ensuing after the expiration of ninety (90) days from the date such well is shut in" in the Hastings and Wyly leases) *with id.* at 1 (excluding such language from the Coates lease).

language drawn from a form document, but others appear to draw from a different form. *Compare* Dkt. 380 at 13 (Bates No. 28,715-28,717, drawn from Form 88), *with id.* at 51 (Bates No. 28,359-28,360, drawn from Form 88-375). And approximately twenty of the *Mittlestaedt* leases have incomplete or missing exhibits or addenda. *See* Dkt. 380 at 14-16, 25-26, 29-30, 36-37, 43, 45, 54, 59, 64, 68.

In view of the foregoing, the Court cannot conclude, as the district court in *Naylor Farms* did, that the proposed lease chart is a generally accurate means of categorizing the leases at issue in this class. *Cf. Naylor Farms*, 923 F. 3d at 796. Even if the Court were assured of the chart's accuracy, the Court could not conclude that the chart establishes that it is possible to address the question of waiver on a class-wide basis. The chart recognizes the existence of seven broad categories of leases, many of which appear to require further subdivision, and some of which include leases with addenda and exhibits that may invite individualized evidence and argument. *Cf. Kunneman Properties*, 2022 WL 1766925, at *6 (denying class certification where unaccounted-for amendments could lead to individualized evidence at the trial of the case, and the leases could not be categorized as "all the same"). The evidence shows that, to determine whether the leases waived an implied duty, the Court would need to review numerous leases in the context of a less-than-400-person class. Dkt. 377 at 15 (indicating that 387 wells held by approximately 350 class members fall within the Gross Proceeds Class). Under such circumstances, it simply cannot be said that the question of waiver can be resolved "in one stroke" for all, or even most, of the proposed class members. *Wal-Mart Stores, Inc.*, 564 U.S. at 350.

The Court now turns to the second allegedly common question: Whether Defendants' sales to affiliated entities can be used to set royalty prices. Dkt. 377 at 19-20. In essence, Plaintiffs argue that Defendant Bullseye Energy, LLC sold the gas it purchased from the Gross Proceeds Class to "affiliate business partners" that it owned or controlled and, because

Case No. 12-cv-411

these sales were not made at arm's length, they cannot be used as a basis for determining the payments made to the class members. Dkt. 377 at 7, 19-20.

Defendants, in response, argue that there is nothing "inherently nefarious" about Bullseye's transactions and that similar transactions have been upheld in other cases. Dkt. 389 at 20-21. But they spend little time arguing that the question of the propriety of these sales necessitates individualized inquiry. At most, Defendants argue that the question of whether the costs incurred were "customary and reasonable" might necessitate some level of individualized review. *Id.* at 23. They do not, however, argue that individualized analysis will be necessary to determine whether sales to unaffiliated entities on identical terms can establish the fairness of the contracts, whether Bullseye and its affiliates were under common control, or whether the sales to Bullseye's alleged affiliates are unsupportable under *Howell v. Texaco, Inc.*, 112 P.3d 1160 (Okla. 2004). Nor does it appear that they could make such arguments: Defendants' brief suggests that these questions are precisely the types of questions that can be resolved by looking at uniform facts, rather than individual ones. *See* Dkt. 389 at 21-23.

In view of the evidence and arguments presented, the Court concludes that this second question is susceptible to class-wide proof. But that, by itself, does not satisfy the predominance inquiry. *See CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1087 (10th Cir. 2014) (recognizing that "the predominance prong asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues" (citation and internal quotation marks omitted)). In this Court's estimation, the question of whether this common question is more important than other individual issues turns, in large part, on the role the question plays in the overall scope of the lawsuit.

On balance, the individual questions of whether each class member's gas was marketable at the wellhead and what obligations each class mem-

Case No. 12-cv-411

ber's lease imposed on Defendants substantially outweigh the common question of the propriety of the sales by Bullseye. To resolve Plaintiffs' claims, the Court will need to evaluate the quality of gas associated with nearly 400 wells and hear evidence concerning the content of at least thirty different leases (by the Court's count), in addition to resolving other individual issues identified by Defendants that may affect the claims of one or more class members.[18] Depending upon how those questions are resolved, it may not be necessary to address the common question identified by Plaintiffs.[19] These individual legal questions predominate over the sole shared question identified by Plaintiffs, and class certification is therefore improper given the facts of this case.

B. Whether Class Treatment is Superior to Individual Litigation

The Court concludes that class treatment is inappropriate for the additional reason that Plaintiffs have failed to establish the superiority requirement of Rule 23(b)(3). In support of their motion, Plaintiffs state that some of the class members whose "royalty interests are quite small" would be unlikely to prosecute their claims individually. Dkt. 377 at 33. But Plaintiffs cite to no evidence in support of their claims that any, let alone many, of the would-be plaintiffs have claims that would not be worth pursuing jointly, through test cases, or in a small-claims proceeding. Plaintiffs cannot simply say "class treatment is superior to individual litigation." They must present evidence that this is the case. Plaintiffs have failed to do so here.

---

[18] These questions include whether any class members have taken inconsistent positions in prior litigation, whether any class members have personal knowledge that would defeat a finding of liability, and whether any of the plaintiffs' claims are barred by the statute of limitations. See Dkt. 398 at 42-43.

[19] Plaintiffs have not argued, for example, that the Court will need to address the question of whether Bullseye's affiliate sales breached any duties owed to class members whose leases waived or released Bullseye from the implied duty to market.

Case No. 12-cv-411

Contrary to Plaintiffs' unsupported argument, the evidence produced by Plaintiffs' expert suggests that some of the class members have strong incentives to pursue relief individually. *See* Dkt. 377-15 at 14 (reflecting damages ranging from $6,000 to $68,000). Furthermore, the manner in which this case has been litigated demonstrates that the potential class members have an incentive to show up and participate in a meaningful way. *See* Dkt. 296 at 4 (noting attendance by objectors at hearing); *id.* at 28 (recognizing that approximately seventy members of the class objected to class-wide settlement). This evidence, coupled with the evidence that individual questions will persist even if class certification is granted, weighs against a finding that class certification is warranted. Accordingly, certification of the Gross Proceeds Class is denied.

## IV.

Finally, the Court concludes that the RICO Class[20] fails to satisfy the elements of Rule 23(b)(3) for the same reasons that apply to the Gross Proceeds Class. Plaintiffs argue that the RICO claims will be established through common evidence of an "underpayment scheme" involving self-dealing affiliated transactions and the issuance of fraudulent royalty statements. Dkt. 377 at 22. But the question of whether there was an "underpayment scheme" will turn on the question of whether there were any underpayments at all—a question that this Court has held should not be resolved on a class-wide basis. *See supra* at III. Similarly, the question of whether the royalty statements were inaccurate will require an assessment of whether the costs associated with processing the gas were necessary to place the gas in marketable condition—another individualized inquiry. *Id.* These individual issues will predominate over the questions of whether

---

[20] For purposes of Section IV, the Court defines the RICO Class to exclude the Net Proceeds Class Members, as follows: "RICO Class" means "All persons in the Gross Proceeds Class who received royalty statements on or after July 24, 2008 with a '0.00' in the deducts column."

Case No. 12-cv-411

Bullseye engaged in self-dealing with other entities that made up an association-in-fact. For this reason, and for the reasons set forth in Section III, *supra*, Plaintiffs have failed to establish that the requirements of Rule 23(b)(3) are satisfied here.

Plaintiffs suggest in their second amended complaint that class treatment of the RICO claims is appropriate under Rule 23(b)(2). *See* Dkt. 154 at ¶ 141. But Plaintiffs' motion seeks relief only under Rule 23(b)(3), and Plaintiffs make no arguments and present no evidence in support of their claim for certification under subparagraph (b)(2). Accordingly, the Court denies certification of the RICO Class.

V.

In conclusion, the Court finds that Plaintiffs' attempt to expand the scope of this dispute to include a Net Proceeds Class is improper and must be denied. With respect to the Gross Proceeds Class and the RICO Class (as redefined by this Court), the Court holds that individual questions predominate over common ones, and that Plaintiffs have failed to establish that class treatment is superior to other methods of resolving the class members' claims. Accordingly, Plaintiffs' Motion for Class Certification [Dkt. 376] is DENIED. Defendant's Motion to Strike [Dkt. 388] is DENIED as MOOT.

DATED this 7th day of June 2024.

JOHN D. RUSSELL
*United States District Judge*