# United States District Court
## for the Northern District of Oklahoma

---

Case No. 12-cv-411-JDR-CDL
CONSOLIDATED WITH
Case No. 15-cv-455-JDR-JFJ

---

KEVIN L. JETER; JOE A. JETER; BARBARA LUCAS; JAMES H. MILLER; SHARON RIGSBY MILLER; LARRY SMITH; JANICE SUE PARKER,

*Plaintiffs*,

*versus*

WILD WEST GAS, LLC; WILD WEST GAS, INC.; BULLSEYE ENERGY, LLC; FOUNTAINHEAD, LLC; KRS&K; CEP MID-CONTINENT, LLC; ROBERT M. KANE; LOUISE KANE ROARK; ANN KANE SEIDMAN; MARK KANE; PAMELA BROWN; GARY BROWN; GASHOMA, INC.; PURGATORY CREEK GAS, INC.; REDBIRD OIL; WHITE HAWK GAS, INC.,

*Defendants*.

— *and* —

KEVIN L. JETER; JOE A. JETER; BARBARA LUCAS; JAMES H. MILLER; SHARON RIGSBY MILLER; LARRY SMITH; JANICE SUE PARKER; JAMES D. ENLOE; CAROLYN R. ENLOE; SCOTT BAILY,

*Consolidated Plaintiffs*,

*versus*

CEP MID-CONTINENT, LLC; ROBERT M. KANE; LOUISE KANE ROARK; ANN KANE SEIDMAN; MARK KANE; PAMELA BROWN; GARY BROWN,

*Consolidated Defendants*.

---

OPINION AND ORDER

---

12-cv-411
c/w 15-cv-455

This consolidated action originated as two separate class actions against sixteen separate defendants. Over the past thirteen years, legal rulings, dismissals, and settlement agreements have narrowed the scope of this case. On the morning of trial, only the individual claims brought by pro se Plaintiffs James Miller, Sharon Miller, Larry Smith, and Janice Parker against Defendants Bullseye Energy, LLC, CEP Mid-Continent, LLC, and KRS&K remained.[1] After Plaintiffs presented their evidence to the jury, Defendants moved for judgment as a matter of law, arguing that Plaintiffs had failed to present enough evidence to permit a jury to consider their claims. Prior to ruling, the Court noted deficiencies in Plaintiffs' proof and permitted Plaintiffs to reopen their case-in-chief to cure the deficiencies. After Plaintiffs closed their evidence a second time, Defendants reasserted their motion for judgment as a matter of law. The Court granted Defendants' motion and now enters this written order memorializing its decision.

## I – Overview of the Case[2]

Plaintiffs own property in Nowata County, Oklahoma, and Washington County, Oklahoma. Each Plaintiff (or predecessor-in-interest) entered at least one oil and gas lease pertaining to his or her property. Under those agreements, each Plaintiff (as the lessor or mineral owner), agreed to allow other parties (the lessees or working interest owners) to obtain, collect, and produce resources—in this case, natural gas—from the Plaintiff's property.

---

[1] When referred to generically, Mr. Miller, Ms. Miller, Mr. Smith, and Ms. Parker are referred to as "Plaintiffs," while Bullseye Energy, CEP, and KRS&K are referred to as "Defendants." The terms "plaintiffs" and "defendants" are used for references to or including those parties dismissed prior to the start of trial.

[2] The information in this section was collected from the materials filed throughout the pendency of this action and is provided for purposes of background and context only. Some of the information in this section was not established by admissible evidence at trial. Only the evidence that was presented at trial, discussed in Section III, *infra*, was considered when resolving Defendants' Rule 50 motion.

12-cv-411
c/w 15-cv-455

In exchange, the working interest owners agreed to pay a royalty equal to a 3/16[th] share of the gross proceeds received when they sold the gas. At all times relevant to this litigation, Defendants Bullseye Energy, LLC and CEP Mid-Continent, LLC, were the working interest owners on the Plaintiffs' leases.[3]

Plaintiffs' wells are part of a large number of Bartlesville-area wells developed by Bullseye Energy and CEP (or their predecessors-in-interest).[4] When Plaintiffs' wells were developed, there were no nearby pipelines capable of collecting the gas produced by the wells. To remedy this issue, Robert Kane of KRS&K[5] and John Eakin of Eakin Exploration[6] built two gathering systems to collect gas for delivery to downstream markets. The White Hawk gathering system, which was completed in 1997 and is owned by White Hawk Gas, Inc., collected gas from wells south of Bartlesville. The Wild West gathering system, which was completed in 2001 and is owned by Wild West Gas, LLC, collected gas from the wells north of Bartlesville.[7]

---

[3] Bullseye Energy owns a fifty-percent interest in the leases, while CEP owns the other fifty-percent interest.

[4] Bullseye Energy was one of the two original working interest owners in some wells; for others, it acquired its interest from KRS&K, an Oklahoma partnership, in or around 1999. CEP acquired its interest in the wells in or around 2007; the interest now held by CEP was originally held by Eakin Exploration or a combination of Eakin Exploration and Fountainhead, LLC.

[5] Robert Kane and his three siblings—Mark Kane, Louise Kane Roark, and Ann Kane Siedman—are the members of KRS&K. For purposes of this opinion, Robert Kane is referred to as "Mr. Kane." His siblings are referred to collectively as the "Kane Siblings."

[6] Although it is clear that Robert Kane and John Eakin helped develop the gathering systems and corresponding legal entities, the evidence at trial did not establish whether Mr. Kane and Mr. Eakin were acting individually or on behalf of another entity when they undertook that work.

[7] Although these two gathering systems were affiliated with and accepted gas from Bullseye Energy and CEP, they also accepted gas from third-party operating companies, including some that were not affiliated with those entities. See Dkt. 550 at 70.

12-cv-411
c/w 15-cv-455

Wild West and White Hawk did not purchase gas directly from the working interest owners. Instead, the working interest owners operated through an intermediary, Bullseye Operating, LLC.[8] Bullseye Operating entered into gas purchase agreements with Wild West and White Hawk on behalf of the working interest owners. Under those agreements, Wild West and White Hawk agreed to purchase gas "at the wellhead" from Bullseye Operating provided the gas satisfied certain standards. Wild West/White Hawk then re-sold the gas to a downstream purchaser, deducted a transportation fee, and delivered the difference (or Bullseye Operating's share of the difference) to Bullseye Operating, who distributed the proceeds to the mineral owners and the working interest owners.[9]

That is the factual landscape that gives rise to Plaintiffs' claims. Plaintiffs executed oil and gas leases with working interest owners (Bullseye Energy and CEP), who developed and operated the wells through an operating company (Bullseye Operating). Bullseye Operating sold gas "at the wellhead" to a gathering company (White Hawk or Wild West), and the gathering company re-sold the gas to an independent downstream purchaser, collected a fee, and distributed the difference to Bullseye Operating. As a result, the royalty paid to Plaintiffs was affected by two sales: The sale from Wild West/White Hawk to the downstream purchaser (which determined the

---

[8] Bullseye Operating was originally named K&E Field Services. John Eakin (individually or through an affiliated entity) owned fifty percent of K&E, while Mr. Kane and the Kane Siblings (either individually or through one of their entities) collectively owned the other fifty percent. Defendants' expert testified that Bullseye Operating was a subsidiary of Bullseye Energy. Dkt. 552 at 141-42.

[9] In this case, the downstream purchaser was Cotton Valley Compression, LLC, a pipeline company formed by Mr. Kane and Mr. Eakin that collected gas from multiple gathering companies, compressed it, and sold it into a larger interstate pipeline. Although Mr. Eakin and Mr. Kane formed and participated in Cotton Valley, the evidence of record shows that neither those individuals nor their affiliated entities held a controlling interest in Cotton Valley.

12-cv-411
c/w 15-cv-455

proceeds received by Wild West/White Hawk), and the reduced amount paid by Wild West/White Hawk to Bullseye and CEP (who determined Plaintiffs' royalties based on that reduced amount).

This series of transactions may not have given rise to any objections if the gathering companies had been unaffiliated with the working interest owners. But that was not the case here. The overlap among Bullseye Energy, Eakin Exploration (CEP's predecessor), Bullseye Operating, Wild West, and White Hawk is substantial: Bullseye Operating, Wild West, and White Hawk were originally created and owned by John Eakin, Robert Kane, and the Kane Siblings—the same individuals who owned and controlled the original working interest owners, KRS&K and Eakin Exploration.[10] Bullseye Operating had employees, but Bullseye Energy, Wild West, and White Hawk had none; those three entities hired Bullseye Operating to provide services for them or on their behalf. And when Bullseye Energy, Bullseye Operating, Wild West, and White Hawk had reason to enter into contracts with each other, Robert Kane would typically execute the contracts on behalf of both entities.

This is why Plaintiffs cry foul. They argue that, when they agreed to accept a 3/16ths royalty on the proceeds received by the working interest owners, they believed the "proceeds received" would be the result of an independent, arms'-length transaction to an unaffiliated entity. Instead, Plaintiffs claim, Bullseye Energy and CEP created a middleman who took a cut of the *true* sales price—the price paid by the downstream third-party purchaser—thereby depriving Plaintiffs of a significant portion of the royalties owed under the contract. Plaintiffs allege that Defendants breached the

---

[10] At first, Mr. Eakin played a key role in managing Bullseye Operating, Wild West, and White Hawk. From about 2002 on, Robert Kane managed the day-to-day operations of Bullseye Energy and Bullseye Operating, Wild West, and White Hawk. CEP assumed Mr. Eakin's interest in at least Bullseye Operating and White Hawk in or around 2007.

12-cv-411
c/w 15-cv-455

contractual obligations owed under the lease agreements by allowing their affiliates to skim funds off the top of the true sales price.

Plaintiffs argue that, to make matters worse, Bullseye and CEP made statements that concealed, or at least failed to accurately disclose, the funds absorbed by the gathering companies. Plaintiffs' leases required the working interest owners to issue royalties to Plaintiffs based on the "gross proceeds" received by the working interest owners for the sale of the gas. And when Plaintiffs received their checks, the check stubs associated with Plaintiffs' royalty payments invariably indicated that no deductions had been taken. Dkt. 551 at 11. Plaintiffs argue that the check stubs, taken as a whole, gave the false impression that no costs associated with gathering, transporting, and compressing the gas collected from Plaintiffs' wells was affecting their royalty payments when, in reality, Bullseye Energy and CEP were allowing those costs (and more) to be absorbed by entities affiliated with, controlled by, and practically indistinguishable from Bullseye Energy and CEP. As a result, Plaintiffs claim they received lower royalty payments than they should have received in the absence of Defendants' self-dealing while the individuals who controlled Bullseye Energy and CEP profited at their expense.

## II- Procedural History

In 2012, Kevin Jeter, Joe Jeter, Barbara Lucas, James H. Miller, and Sharon Rigsby Miller filed a class-action lawsuit alleging that Wild West Gas, LLC, Wild West Gas, Inc., Bullseye Energy, Inc., Fountainhead, LLC, and KRS&K had breached their contractual and fiduciary duties by underpaying royalties owed under oil and gas production leases and engaged in fraud by making misrepresentations concerning those royalties. *See* Dkt. 2 at 1-5.[11] The

---

[11] This action was consolidated with 15-cv-455-JDR-JFJ, which involved overlapping parties and claims. Dkt. 171. For purposes of this opinion, the Court refers to this lead action as *Jeter I*, and the later-filed action as *Jeter II*. Citations to the record in *Jeter I* are
*(footnote continues)*

12-cv-411
c/w 15-cv-455

complaint was later amended to introduce similar claims by Plaintiffs Larry Smith and Janice Sue Parker. Dkt. 33.

A second lawsuit was filed in 2015 by the aforementioned individuals, together with James Enloe, Carolyn Enloe, and Scott Baily. The plaintiffs in that case sued CEP Mid-Continent LLC, Robert Kane, Louise Kane Roark, Ann Kane Seidman, Mark Kane, Pamela Brown, and Gary Brown for violations of the Racketeer Influenced and Corrupt Organizations Act that allegedly arose out of false statements pertaining to the payments made under oil and gas production leases. *See Jeter II* at Dkt. 2. Shortly thereafter, the complaint in *Jeter I* was amended a second time, adding CEP Mid-Continent, Robert Kane, Louise Kane Roark, Ann Kane Seidman, Mark Kane, Pamela Brown, Gary Brown, and several other entities as defendants and asserting RICO claims in addition to the original claims of breach of contract, breach of fiduciary duties, and fraud. Dkt. 154. The two cases, *Jeter I* and *Jeter II*, were consolidated by Court order, and seven corporate defendants were dismissed from the consolidated proceeding. Dkts. 142, 151, 171.[12]

In the years that followed, the plaintiffs filed a motion for class certification with an amended class definition, which the defendants objected to. Dkt. 219. While that motion was pending, the Court stayed the proceedings to facilitate settlement negotiations. Dkt. 231. Two of the named plaintiffs reached partial settlement agreements, and the defendants filed a motion for preliminary approval of that agreement over the objections of the non-settling

---

identified solely by docket number. Citations to *Jeter II* are identified by both the docket number and the abbreviated case name. In both cases, all citations use CM/ECF pagination.

[12] Gashoma, Inc., Purgatory Creek Gas, Inc., Redbird Oil, Wild West Gas, LLC, and White Hawk Gas, Inc. were dismissed by Court order. Dkts. 151, 171 at 1, n.1. Fountainhead, LLC was dismissed by stipulation. Dkts. 142, 171 at 1, n.1. Wild West Gas, Inc. was dismissed because the second amended complaint did not assert unique charges against that entity. *See* Dkt. 154 (indicating that Wild West Gas, LLC was formerly known as Wild West Gas, Inc., and asserting charges only against the LLC).

12-cv-411
c/w 15-cv-455

plaintiffs. Dkts. 234, 244.[13] The Court entered an order preliminarily approving the proposed settlement but, after conducting a multi-part fairness hearing attended by numerous objectors, the Court denied final approval of the proposed settlement, concluding that the proposed settlement was not fair, reasonable, or adequate; the litigation did not raise questions of law or fact that were "so insurmountable" that they would impair the value of the class members' claims; and the value of an immediate recovery would not outweigh the value of possible future relief. Dkts. 262, 324.

A little less than one year after the proposed settlement was denied, Defendant Bullseye Energy, Inc., advised it had entered into bankruptcy proceedings and the case was stayed. Dkts. 340, 343, 367. When the stay was lifted, the plaintiffs filed a new motion for class certification, which introduced a class definition that differed from the one set forth in the operative pleadings. Dkt. 376. The defendants objected to the motion and asked the Court to strike the amended class definition. Dkts. 388, 389.

The Court denied the motion for class certification, denied the corresponding motion to strike as moot, and granted motions to withdraw by counsel for James and Sharon Miller, Scott Baily, Carolyn Enloe, James Enloe, Barbara Lucas, Janice Parker, and Larry Smith (who proceeded to represent themselves pro se). Dkts. 432, 454, 457. The remaining defendants filed motions for summary judgment [Dkts. 471-476], which only the pro se plaintiffs opposed. The remaining plaintiffs, Kevin and Joe Jeter, dismissed their claims against all the remaining defendants. Dkt. 498.

The Court ruled on the motions for summary judgment on July 1, 2025, granting the motions for some claims and defendants and denying them for others. Those rulings significantly curtailed the scope of this action. The

---

[13] A subset of the named plaintiffs—Mr. Baily, Mr. and Mrs. Enloe, Ms. Lucas, the Millers, Ms. Parker, and Mr. Smith—opposed the motion. Dkt. 249.

12-cv-411
c/w 15-cv-455

Court (1) entered summary judgment in favor of defendants Pamela Brown, Mark Kane, Louise Kane Roark, Anne Kane Seidman, and Gary Brown, resolving all claims against those parties [Dkt. 500]; (2) entered summary judgment in favor of KRS&K with respect to all claims addressed in KRS&K's motion, leaving only an accounting claim pending against that entity [*id.*]; (3) granted Robert Kane's motion for summary judgment, resolving all claims against him [Dkt. 501], (4) denied Bullseye Energy's motion for summary judgment, leaving in place plaintiffs' claims for breach of contract, fraud, and an accounting against that entity [*id.*], and (5) granted in part CEP's motion for summary judgment, dismissing the RICO claims but leaving in place the plaintiffs' claims for breach of contract, fraud, and an accounting against CEP [*id.*].

The surviving claims were set for trial in August 2025. Because of the plaintiffs' pro se status, the Court held two separate pretrial conferences. During the first conference, the Court clarified several important points regarding the plaintiffs' burden at trial. First, it advised that no pro se party could speak on behalf of any other pro se party, and that each plaintiff would be required to represent him or herself. Dkt. 528 at 7. Second, the Court ensured that the plaintiffs were aware of their obligation to prove each essential element of each of their claims. *Id.* at 12-14.[14] Third, the Court advised that the plaintiffs would be required to establish both the essential elements of their claims and the amount of their damages through admissible evidence, and the plaintiffs confirmed their understanding. *Id.* Fourth, the Court advised that the plaintiffs' proposed expert, Jana Garrison, might not be permitted to testify because she had not been previously disclosed as an expert in accordance with the applicable rules. *Id.* at 16-18. Fifth, the Court asked whether any of the individual plaintiffs would testify at trial and was advised

---

[14] Ms. Parker was unavailable to attend this hearing in person but participated by phone. Dkts. 512, 513.

12-cv-411
c/w 15-cv-455

that they had no plans to do so. *Id.* at 19-20.[15] Sixth, the Court advised that each plaintiff would be required to provide his or her "own damage numbers" using his or her own evidence, and that the plaintiffs could not rely on a collective damage model or refer to damages allegedly sustained by the class as a whole. The plaintiffs indicated they understood. *Id.* at 70-71. Throughout the hearing, the Court advised the plaintiffs that they must be familiar with and abide by both the applicable Federal Rules of Evidence and Civil Procedure and the Court's local rules of practice. *Id.* at 67 ("And so one of the reasons I'm having this conference . . . and the reason I'm having two is because I'm trying to alert you to make sure you understand what is evidence and what's not evidence . . . . I just want you to be aware of the potential pitfalls, and I'm just trying my best to raise where those might be."); *id.* at 14-15, 18, 31-32, 41-42, 63.

After the pretrial conference, the scope of the litigation further narrowed. James Enloe, Carolyn Enloe, and Scott Baily were originally named as plaintiffs in *Jeter II*, which asserted only RICO claims. They were never added as named parties to the complaint in *Jeter I*, the only action in which the remaining live claims (breach of contract, fraud, and accounting) were asserted, and they never amended the pleading in *Jeter II* to assert claims for breach of contract, fraud, or accounting against any defendant. Mr. Enloe, Ms. Enloe, and Mr. Baily sought leave to file a complaint asserting those claims against Bullseye, CEP, and KRS&K. Dkt. 519. The Court denied the motion as untimely, terminating the Enloes and Mr. Baily as parties to the action. Dkt. 529. Then, on the morning of trial, the Court dismissed Barbara Lucas's claim without prejudice for lack of prosecution because Ms. Lucas failed to appear. Dkt. 548. Thus, on August 11, 2025, the case proceeded to

---

[15] The Court had previously provided the plaintiffs with an opportunity to submit the questions for their own direct examinations so that the Court could determine how best to present their testimony.

12-cv-411
c/w 15-cv-455

trial on three claims (breach of contract, fraud, and accounting) brought by four Plaintiffs ( James Miller, Sharon Miller, Larry Smith, and Janice Parker) against CEP, Bullseye, and (for purposes of the accounting claim only) KRS&K.

### III – Plaintiffs' Evidence and Arguments

Plaintiffs' case proceeded to trial on only three of the originally asserted legal claims. And as the Court noted during the pretrial conference, Plaintiffs were required to present evidence sufficient to establish each essential element of each of those claims. To prevail on their breach-of-contract claims, each Plaintiff was required to introduce evidence that, if true, would permit a jury to find that (1) the Plaintiff entered into a contract with a Defendant; (2) the Defendant breached the contract; and (3) the Plaintiff suffered "damages as a result of that breach." *Emergency Servs. of Oklahoma, PC v. United HealthCare Ins. Co.*, 650 F. Supp. 3d 1211, 1220 (W.D. Okla. 2022) (citing *Morgan v. State Farm Mut. Auto. Ins. Co.*, 2021 OK 27, ¶ 21, 488 P.3d 743, 748. To recover for fraud,[16] each Plaintiff was required to introduce evidence demonstrating that (1) a Defendant "made a material misrepresentation"; (2) the representation was false; (3) the Defendant knew the representation was false or made the representation "in reckless disregard of the truth"; (4) the Defendant made the representation "with the intention that it should be acted upon" by the Plaintiff; (5) the Plaintiff "acted in reliance upon" the representation; and (6) the Plaintiff "thereby suffered injury." *Sturgeon v. Retherford Publications, Inc.*, 1999 OK CIV APP 78, ¶ 34, 987 P.2d 1218, 1228; *see also Applegate v. State Farm Mut. Auto. Ins. Co.*, 61 F. App'x 552, 555 (10th Cir. 2003). And to recover on their accounting claims, each

---

[16] Plaintiffs' fraud claims were alternatively styled as claims for deceit. The two claims are the same. *See Sturgeon v. Retherford Publications, Inc.*, 1999 OK CIV APP 78, ¶ 34, 987 P.2d 1218, 1228 (setting forth the six elements necessary to "recover under the theory of fraudulent misrepresentation, or deceit").

12-cv-411
c/w 15-cv-455

Plaintiff was required to prove either that (1) the Defendant owed him or her "a legal duty to account created by contract and fiduciary status"; (2) the Plaintiff had a "cognizable legal right to recover [against the Defendant], but no other adequate remedy at law"; or (3) the Plaintiff has an enforceable accounting right that the Court could exercise jurisdiction over.[17] *See Cell Energy, LLC v. Devon Energy Prod. Co., L.P.*, No. CV 16-188 GJF/LAM, 2016 WL 9408580, at *4 (D.N.M. Oct. 11, 2016) (quoting *Margaret Blair Trust v. Blair*, 2016 OK CIV APP 47, ¶¶ 16-19, 378 P.3d 65, *reh'g denied* (June 15, 2016)).

Plaintiffs initially presented the testimony of five witnesses to establish the elements of their claims. At the close of their evidentiary presentation, Defendants moved for judgment as a matter of law under Rule 50 of the Federal Rules of Civil Procedure, arguing that Plaintiffs had failed to present evidence sufficient to establish damages (an essential element of their contract and fraud claims), reliance (an essential element of their fraud claims), or a right to an accounting. The Court afforded Plaintiffs an opportunity to reopen their case to cure these deficiencies, which Plaintiffs availed themselves of. But when Plaintiffs rested a second time, Defendants once again argued that Plaintiffs had failed to present evidence of damages, reliance, or a right to an accounting. The Court agrees.

The following summary recites, in broad strokes, the evidence and arguments presented by Plaintiffs at trial. Because Plaintiffs failed to establish only certain elements of their claims, this summary focuses on the evidence

---

[17] The Oklahoma Court of Civil Appeals has recognized that, in addition to the foregoing, accounting may be available as a *remedy*, rather than a claim, "when a plaintiff prevails on a separate theory of recovery." *Cell Energy, LLC v. Devon Energy Prod. Co., L.P.*, No. CV 16-188 GJF/LAM, 2016 WL 9408580, at *4 (D.N.M. Oct. 11, 2016) (citing *Margaret Blair Trust*, 2016 OK CIV APP 47, ¶ 22, 378 P.3d at 74). Because the Court grants Defendants' Rule 50 motion on Plaintiffs' remaining claims, that avenue of recovery is not available here.

12-cv-411
c/w 15-cv-455

connected with those elements—namely, damages, reliance, and the legal obligation to account. Although this summary does not discuss each and every statement made or each and every exhibit discussed at trial, the Court reviewed and considered all of the evidence introduced and discussed at trial when reaching its decision to grant Defendants' motion.

## A. Mr. Kane's Testimony

Plaintiffs' case began with the testimony of Robert Kane. Mr. Kane provided background regarding the development of the wells, the creation of the Wild West and White Hawk gathering systems, and the ownership and organization of the entities that are, or have been, involved in the development, collection, production, and sale of gas produced from Plaintiffs' wells. Dkt. 550 at 36-112.[18] Although there are some gaps in the history he

---

[18] Mr. Kane and his siblings are partners in Defendant KRS&K, an Oklahoma partnership. Dkt. 550 at 42. Prior to 1999, KRS&K acquired fifty-percent interests in oil and gas leases south of Bartlesville, Oklahoma. *Id.* at 41-43; *id.* at 63, 73. Mr. Kane (presumably acting through White Hawk Gas, Inc., although this is not clear from the record) created the White Hawk gathering system to purchase gas from various wells, collect the gas, and transfer it into the Hogshooter line. *Id.* at 45, 50. The White Hawk system, which was operational in or around 1997, produced "dry coal bed methane gas" that satisfied the purchaser's composition requirements and was capable of being sold to and burned by the city of Bartlesville without any treatment. *Id.* at 46-48.

KRS&K did not hold its oil and gas interests for very long. Mr. Kane testified that, to the extent KRS&K had any interest in the wells connected to the White Hawk gathering system, it transferred those interests to Defendant Bullseye Energy in 1999. *Id.* at 41-43 ("So there was never any production from those leases while KRS&K owned them."); *id.* at 63.

Later, Bullseye Energy began acquiring leases near Wann, Oklahoma, a city north of Bartlesville. *Id.* 57. Bullseye Energy had a fifty-percent interest in the wells, and Mr. Kane's business partner, John Eakin, originally held the other fifty-percent interest. *Id.* at 57, 73. They started a new gathering system to collect gas from those leases, which was operated by Wild West Gas, LLC. *Id.* at 62-63. The gas that was collected by the Wild West gathering system could not be sold into the Southern Star line—a major 900-pound interstate pipeline—without compression. *Id.* at 78-79. So Mr. Kane and Mr. Eakin decided to form a new company, Cotton Valley Compression, LLC, to purchase gas, compress it, and

*(footnote continues)*

12-cv-411
c/w 15-cv-455

presented, Mr. Kane's testimony established that he and his siblings owned (directly or indirectly) fifty percent of Bullseye Energy, Bullseye Operating, White Hawk, and Wild West and that, from 2007 onward, CEP owned the other fifty-percent interest. *See* Dkt. 550 at 38-39, 50-51, 65-69, 90-91, 105-08; *see also* Dkt. 551 at 72 (explaining how CEP acquired its interests in Bullseye Energy and related entities); Plfs. Ex. 28. Mr. Kane testified that he was the primary decisionmaker for Wild West, White Hawk, Bullseye Energy, and Bullseye Operating during much, if not all, of the period relevant to this litigation, and that CEP's involvement in the entities was primarily financial. *See* Dkt. 550 at 38-39, 50-51, 65-69, 90-91, 97-98, 105-08.[19] His testimony also established that Bullseye Energy, Wild West, and White Hawk had no employees of their own, and that all three of those entities used Bullseye Energy (or its predecessor, K&E Field Services) to perform work for them. *Id.* at 65-69, 90-92.

Mr. Kane provided a high-level overview of the sales from Plaintiffs to Bullseye Energy/CEP, from those Defendants to the gathering companies, and from the gathering companies to the downstream purchasers. *See generally* Dkt. 550 at 97-113. Mr. Kane explained that Plaintiffs' leases, which were admitted into evidence,[20] required Bullseye Energy/CEP to pay each Plaintiff

---

sell it into the Southern Star pipeline. *Id.* at 78-79, 86-88. Cotton Valley purchased gas from White Hawk, Wild West, and other, unaffiliated entities. *Id.* at 74, 85-88, 92, 97-98, 109-112; Dkt. 551 at 102-04.

[19] Mr. Eakin initially exercised control over some of the entities. Dkt. 550 at 38-39, 43-44, 51, 65-69, 90-91. Mr. Eakin "sold a part interest of his business" in the early 2000's but remained involved as an "operator/executive of the project" for an unidentified amount of time afterward. *Id.* at 38-39.

[20] The leases identify the initial working interest owners. Plaintiffs established through Mr. Kane's testimony that the working interest in the leases was ultimately transferred to Bullseye Energy and CEP.

12-cv-411
c/w 15-cv-455

3/16ths[21] of "the gross proceeds received for the gas sold, used off the premises, or in the manufacture of products therefrom, but in no event more than [3/16ths] of the actual amount received by [Bullseye and CEP] . . . ." Exhibits 3, 3-A, 3-B, 3-C.[22] Mr. Kane admitted, and the leases demonstrate, that the leases did not expressly permit Bullseye Energy/CEP to deduct any costs from the "gross proceeds received" before calculating the royalty owed to Plaintiffs. Dkt. 551 at 6-8. Instead, Bullseye Energy and CEP were required to pay Plaintiffs the designated fraction of the amount of money they actually received from selling Plaintiffs' gas. *See* Dkt. 550 at 36.

Mr. Kane explained that, at the time Bullseye Energy/CEP purchased Plaintiffs' gas, they did not know what the "gross proceeds received" would be. Bullseye Energy/CEP, acting through Bullseye Operating, LLC, sold Plaintiffs' gas to a gathering company (either Wild West or White Hawk, depending on the well's location).[23] Dkt. 550 at 54-55; Plfs. Ex. 6. That transaction was the subject of a separate agreement—a gas purchase agreement—

---

[21] Three of the leases contained a modification amending all references from a 1/8th royalty to a 3/16ths royalty. *See* Exs. 3, 3-A, 3-B. That modification is not clear on Exhibit 3-C. Testimony establishes that the leases at issue used similar language, but it is not clear that the amendment was made on all leases. *Compare* Dkt. 551 at 81-82 ("Q: Okay. So Plaintiffs are entitled to 3/16ths of the proceeds received by Bullseye and the other lessees, correct? A: Yes."), *with id.* at 113 ("Q: Okay . . . . As we've spoken about . . . most of them were amended to 3/16ths . . . . A: Yes."). To the extent there is a dispute as to the royalty owed under the lease marked as Exhibit 3-C, that dispute is not material to the Court's analysis.

[22] There was some disagreement at trial as to whether paragraph 2 or paragraph 3 determines the royalties owed to Plaintiffs. Dkt. 550 at 119-23; Dkt. 551 at 7-10. By its terms, paragraph 2 applies to gas "of whatsoever nature or kind," while paragraph 3 applies to "gas produced from any *oil* well." Plfs. Ex. 3 (emphasis added); *see also* Plfs. Ex. 3-C. The evidence at trial does not establish that any oil was ever produced from Plaintiffs' wells. *See* Dkt. 551 at 101. Paragraph 2 controls.

[23] The Court refers to Wild West and White Hawk interchangeably, because the record is, at times, unclear as to which gathering company is being referenced by a particular witness or attorney. It appears, however, that Plaintiffs' gas travelled through the Wild West gathering system. *See* Dkt. 551 at 85-87.

12-cv-411
c/w 15-cv-455

between Bullseye Operating and Wild West/White Hawk. Dkt. 550 at 59-60.[24] Under the gas purchase agreement, Wild West/White Hawk agreed to purchase gas that met specific standards from Bullseye Operating.[25] Wild West/White Hawk would then re-sell the gas received from Bullseye Operating and others. Wild West/White Hawk deducted a "transportation fee" of thirty percent of the weighted average sales price (or $0.87 per MMBTU, whichever was less) from the amount it received for Bullseye Operating's gas,[26] and remit the difference to Bullseye Operating. *See* Plfs. Ex. 6; Dkt. 550 at 113-14, 124-25; *see also* Dkt. 551 at 18 (testifying that Wild West and White Hawk had the same contracts with Bullseye Operating).

Mr. Kane explained that the amount paid to Bullseye Operating (and, by extension, the amount paid to Plaintiffs, Bullseye Energy, and CEP) was determined by the price paid to Cotton Valley Compression, LLC.[27]

---

[24] Mr. Kane admitted that he authorized the gas purchase agreements at issue in this case on behalf of both the seller (Bullseye Operating) and the buyer (Wild West/White Hawk). Dkt. 550 at 59-60, 70-71, 90, 106-09, 116.

[25] Wild West's standards were set to match those required by the interstate pipeline that Wild West sold to. *See* Dkt. 551 at 86-87. Although Wild West was permitted to accept gas that fell below the articulated specifications, and would sometimes do so, Plaintiffs' gas generally satisfied the Wild West/White Hawk standards, and Bullseye Energy cancelled at least one contract when gas fell below those standards. Dkt. 551 at 48, 86-87, 100-03.

[26] Because Wild West and White Hawk purchased gas from other providers [Dkt. 550 at 70], the payment to Bullseye Operating was not based on the full purchase price received by Wild West/White Hawk. Instead, Wild West/White Hawk determined the proportionate share of the gas it delivered that was attributable to Bullseye Operating and then multiplied that number by the weighted average sales prices less the applicable transportation fee, as set forth in the gas purchase contract. *See* Plfs. Ex. 6.

[27] Cotton Valley collected gas from several gathering companies, compressed it, and delivered it into a high-pressure interstate pipeline. Dkt. 550 at 74-79, 85. Although Mr. Kane and Mr. Eakin were involved in the creation of Cotton Valley, they did not own a controlling interest in that entity. Dkt. 550 at 109; Dkt. 551 at 55-56 (explaining ownership of Cotton Valley); Dkt. 551 at 103-04 (explaining that the membership of Cotton Valley changed over time). Oil and gas producers unaffiliated with Mr. Kane, Bullseye Energy, and *(footnote continues)*

12-cv-411
c/w 15-cv-455

Specifically, the sales price obtained by Cotton Valley determined the amount paid to Wild West/White Hawk. Dkt. 550 at 112-113. Wild West/White Hawk would determine the proportion of that payment allocable to Bullseye Operating, deduct its transportation fee from that amount, and deliver the difference to Bullseye Operating. And Bullseye Operating would then distribute, on a pro rata basis, 3/16ths of the amount it received to Plaintiffs and other royalty owners. The remainder was distributed to Bullseye Energy/CEP. Dkt. 550 at 112-24; Dkt. 551 at 30-49, 87-88, 102-104.

Mr. Kane acknowledged during his testimony that Plaintiffs had no input into the gas purchase contract between Bullseye Operating and Wild West/White Hawk and had no say in the amount of money that Wild West/White Hawk would keep for themselves. Dkt. 550 at 71-72, 93-94, 122-23. He also agreed that the leases did not authorize retention of a transportation fee, nor did they indicate that Bullseye Energy/CEP would sell to a gathering company that would withhold a transportation fee. Dkt. 551 at 8-9. Mr. Kane acknowledged that the sale into the interstate pipeline was the first sale "that didn't involve Bullseye Energy, KRS&K, White Hawk Gas" or any other entity under the ownership of Mr. Kane and the Kane Siblings. Dkt. 550 at 58; *id.* at 60 ("Q: So basically you were selling it to yourself? A: The – it was one entity to another, but they were under the Kane umbrella, I agree."). Mr. Kane agreed that he worked both sides of the deal between the working interest owners and Bullseye Operating, and he acknowledged that this contract "with [him]self" was not disclosed to Plaintiffs. Dkt. 550 at 90-97, 106-07. *See also* Dkt. 551 at 67; Plfs. Ex. 24.

Plaintiffs established through Mr. Kane's testimony that the transportation fee retained by Wild West/White Hawk was not reflected on the check

---

CEP also joined Cotton Valley and had rights in the management of that entity. Dkt. 551 at 54-55, 103-04.

12-cv-411
c/w 15-cv-455

stubs associated with Plaintiffs' royalty payments. Dkt. 550 at 113-14; *see* Plfs. Ex. 5. The check stubs had a column labelled "DEDUCTS" that always reflected "0.00." *See* Plfs. Ex. 5. Beginning in 2004, the stubs also included a statement that the payments made to Plaintiffs were "based upon all proceeds paid to the producer [Bullseye Operating] under a contract between the producer and its purchaser (including affiliated purchasers). The contract authorizes the deduction of all gathering, transportation, compression, and similar charges incurred by the purchaser, directly or indirectly, from the amount paid to the producer." *E.g.*, *id.*; Dkt. 551 at 11-27. Plaintiffs suggested in their questions to Mr. Kane that Bullseye Operating was required to list "each and every deduction" taken from Plaintiffs' royalty, including those taken by affiliated entities, but Mr. Kane testified that he was only required to list the deductions taken by the working interest owner, not those taken by the gathering company. Dkt. 551 at 25-27.

Mr. Kane's testimony was insufficient to permit a jury to determine the amount of Plaintiffs' damages. Mr. Kane did not testify about the total amount paid to each Plaintiff, nor did he testify to the total amount withheld by Wild West/White Hawk. Although Plaintiffs introduced eleven check stubs reflecting payments made to Plaintiff Sharon Rigsby Miller in 2018 and 2019 through Mr. Kane's testimony, *see* Plfs. Ex. 5, they did not introduce paystubs reflecting the total amounts paid to each Plaintiff through Mr. Miller or otherwise. *See* Dkt. 548-2 (reflecting admitted exhibits, and demonstrating that Plaintiffs' Exhibits 21, 34 and 35, which reflected payments made to Plaintiffs, were not admitted).[28]

---

[28] A limited number of Defense Exhibits referencing individual payments made to Plaintiffs were discussed at trial. *See* Defs. Exs. 208, 209, 222; Dkt. 552 at 25-26. None of these set forth the total amounts paid to—or the total amounts withheld from—any Plaintiff.

12-cv-411
c/w 15-cv-455

Mr. Kane explained that the transportation fee collected by the gathering company was not constant. Although, beginning in 2014, Wild West/White Hawk would sometimes collect a thirty-percent fee, the amount of the fee was capped at $0.87 cents per MMBTU when "gas got above 2.90 cents." Dkt. 550 at 125. He did not provide, and was not asked to provide, any information about how frequently the cap was utilized. Mr. Kane also testified that the thirty-percent fee was the "going rate for the transportation charges in the area." *Id.*; Dkt. 551 at 95-96 (testifying that the transportation fee was determined by referring to third-party contracts).[29] This testimony was corroborated by evidence of purchase contracts between Wild West and other, unaffiliated operating companies, all but one of which permitted Wild West to collect a thirty-percent transportation fee. *See* Dkt. 551 at 88-95 (testifying that Wild West required the same quality of gas from all the producers it accepted gas from, including the unaffiliated producers, and charged a thirty-percent transportation fee on those contracts); Defs. Ex. 73 (thirty-percent transportation fee without a cap); *see* Defs. Exs. 67, 69-72; *see also* Defs. Ex. 66 (twenty-five-percent transportation fee).

### B. Mr. Maloney's Testimony

Next, Plaintiffs presented the testimony of Dan Maloney, whose mother, Janet Maloney, received royalty payments from Bullseye Energy. Dkt. 551 at 138-41. Mr. Maloney collected royalty payments and check stubs on behalf of his mother's estate when he learned about the disclaimer on affiliate payments that was added to her check stubs in 2004. *Id.* He testified about the information he received from Mr. Kane for his mother's leases and payments, but he provided no information about Plaintiffs' leases, the amount of money Plaintiffs received or should have received, or Plaintiffs'

---

[29] Mr. Kane also testified that some gathering systems in the area charged a higher transportation fee. Dkt. 551 at 83 (testifying that the Scissortail gathering system charged a fifty-percent transportation fee).

12-cv-411
c/w 15-cv-455

understanding of or responses to the information they allegedly received from Bullseye Energy and CEP. Dkt. 551 at 138-148.

## C. Ms. Brown's Testimony

Plaintiffs called Pamela Brown, an employee of Bullseye Operating. Dkt. 551 at 153. Ms. Brown testified that she provided gas marketing and accounting services for Bullseye Energy and other related companies. *Id.* at 149-54. Ms. Brown provided background information on the ownership of the entities she provided services for, the work those entities performed, and how that work developed. *Id.* at 152-56. Ms. Brown testified that she never calculated royalty payments; instead, she subcontracted that work to a third party, Paul Morris. *Id.* at 156-57, 160-62, 167-68.[30] Ms. Brown explained the method she used to market gas to downstream purchasers, the fact that the price of gas would depend on a variety of factors, and the marketing tools she used to set gas prices. *Id.* at 158-62. She also testified that Cotton Valley collected gas from several producers and compressed it so that it could be sold into the higher-pressure Williams pipeline, which would only accept gas at a high pressure. *Id.* at 162-63.

Ms. Brown clarified that she had no detailed knowledge about the gas purchase contracts between Wild West and its producers, nor did she know how the sales price paid to Bullseye Energy was determined. *Id.* at 164-66. Ms. Brown explained that she was not involved in sending royalty checks to Plaintiffs (beyond sending information to Paul Morris) and was not familiar with the transportation fees charged by Wild West/White Hawk. *Id.* at 167-68. Ms. Brown provided no information that would permit a jury to determine the total amount of money paid to each Plaintiff, the monthly amounts paid to each Plaintiff, the total amount the transportation fees withheld by Wild

---

[30] Plaintiffs did not introduce the materials Ms. Brown transmitted to Mr. Morris.

20

12-cv-411
c/w 15-cv-455

West/White Hawk, or the specific information that was used to calculate Plaintiffs' royalty payments or Wild West/White Hawk's transportation fees.

### D. Mr. Morris's Testimony

Plaintiffs next presented Paul Morris, an independent contractor who calculated the royalty checks based on information provided to him and ensured the payments were in accordance with the royalty owners' contracts. Dkt. 552 at 12-18, 22-24. He acknowledged that Wild West deducted a thirty percent or eighty-seven-cent per MMBTU transportation fee, whichever was less, from the amount of money it received for the sale of Bullseye Operating's gas. He stated that the transportation fee Wild West collected from Bullseye Operating was the same or similar to the fee collected from other operators. *Id.* at 18-19.

Mr. Morris provided a high-level overview of how the price paid to Plaintiffs (and other royalty owners) was calculated. He explained that, for each month, he was provided with the negotiated price per MMBTU agreed to by each third-party that purchased gas from Cotton Valley, the amount of gas (in MMBTUs) delivered to each purchaser, and the total amount paid to Cotton Valley by each purchaser. *Id.* at 26-27; Defs. Ex. 89. Cotton Valley added together the amounts it received from all purchasers in a given month and subtracted its expenses from that sum. Defs. Ex. 89. The difference was allocated to the gathering companies (including Wild West) who contributed gas to Cotton Valley during that production month. Dkt. 552 at 27. Wild West then issued payments to Bullseye Operating (and other operating companies) that reflected the operating company's share of the money Wild West received, minus the applicable transportation fee. Bullseye Operating then took the amount it received, allocated a portion to each well based on the total volume produced by the well (as a percentage of the total volume produced by all wells that month), with an adjustment for the quality of gas. *Id.* at 27-33.

12-cv-411
c/w 15-cv-455

Both the working interest owners and royalty owners were compensated based on that final allocation in accordance with their contracts.

Although Mr. Morris presented a general explanation of how royalty payments were determined, he did not provide testimony regarding the precise amount of the transportation charges paid to Wild West, the amount of money paid to any or all of the Plaintiffs, or the number of times that the eighty-seven-cent cap affected Plaintiffs' royalty payments. *Id.* at 12-50. Mr. Morris did discuss exhibits that set forth the total MMBTUs produced by Wild West from January 2008 through November 2016 and the average net price per MMBTU obtained by Wild West for the month of October 2014. *See* Defs. Exs. 89, 161. But Plaintiffs did not use his testimony to introduce evidence of the average MMBTU price received by Wild West for each of the months during which Plaintiffs allegedly incurred damages, nor did they introduce other exhibits setting forth data that would permit a jury to calculate the amount that Plaintiffs would have received but for the allegedly improper transportation fees charged by Wild West.

### E. Proffered Testimony of Jana Garrison

Plaintiffs called Jana Garrison, an accountant who provided bookkeeping, payroll, and other services for a number of clients. Dkt. 552 at 54. Ms. Garrison was prepared to testify to calculations she performed regarding natural gas payments. *Id.* Defendants objected, arguing that Ms. Garrison had not been disclosed or designated as an expert witness and should not be permitted to testify as to calculations she performed in anticipation of litigation. *Id.* During a sidebar, the Court confirmed that Ms. Garrison's calculations had been created for purposes of litigation, were produced within months of the trial, and had never been produced as part of any expert report. *Id.* at 54-56.

Based on Defendants' objection, the Court excused the jury and conducted an examination of Ms. Garrison. During that examination, Ms.

12-cv-411
c/w 15-cv-455

Garrison testified that she provided bookkeeping services and prepared tax returns for Mr. Miller, his wife, and his companies and that all the information she used to provide those services was provided by Mr. and Mrs. Miller. *Id.* at 61-64. Ms. Garrison testified that she prepared a spreadsheet for this case using check stubs received by Plaintiffs, the price they received for their gas, and "what the prices should have been." *Id.* at 64. She determined the loss attributable to each Plaintiff using "[s]imple math" comparing the amount that was paid to the amount that should have been paid. *Id.* She then conducted a simple interest calculation to determine the total amount owed with interest, using a twelve-percent interest rate provided by Mr. Miller. *Id.* at 66-67.

When asked, Ms. Garrison stated that Mr. Miller provided her with "the information of what should have been paid," and that she did not "do any kind of an independent investigation as to the information of the amounts that should have been paid" because the information—a schedule—appeared legitimate. *Id.* at 64-67. The schedule was later identified as originating from the Henry Hub Natural Gas Index. *Id.* at 69-70. Ms. Garrison acknowledged that the calculations she performed were not part of her normal line of work, and that all of the work she did to prepare the spreadsheets was done recently and not in the course of her normal business. *Id.* at 68-69, 72-74. She also admitted that she had no experience with gas marketing, index pricing, or the Henry Hub Index prior to performing the calculations Mr. Miller requested. *Id.* at 74-75.

Following the examination of Ms. Garrison, Defendants renewed their written motion [Dkt. 546] to exclude portions of Ms. Garrison's testimony and opinions. The Court granted the motion in part, finding that Ms. Garrison's calculations, which were identified as Plaintiffs' Exhibit 37 (with corresponding subparts) did not meet the requirements of Rule 702 of the Federal Rules of Evidence because the calculations were not performed during the

12-cv-411
c/w 15-cv-455

ordinary course of Ms. Garrison's duties for Plaintiffs. *Id.* at 77-78. Although the Court agreed that Ms. Garrison was capable of performing mathematical calculations, it concluded that her calculations were based upon information that was outside the realm of her expertise, and that her analysis was not reliable as a result. *Id.* The Court indicated that it would, however, permit Ms. Garrison to testify as a percipient witness.

Once the scope of Ms. Garrison's testimony was curtailed, her testimony was quite brief. She testified about the definitions of the terms "zero" and "gross" in the context of accounting, but she provided no other substantive evidence. *Id.* at 82-84. Once Ms. Garrison was done testifying, Plaintiffs stated that they had concluded their evidentiary presentation. *Id.* at 84.

## F. The Rule 50 Colloquy

Defendants moved for judgment in their favor under Rule 50 of the Federal Rules of Civil Procedure.[31] They argued that there was no evidence showing reliance by any Plaintiff on any alleged fraudulent statement by any Defendant because Plaintiffs had not testified. Plaintiffs had therefore failed to establish an essential element of their fraud claim. Dkt. 552 at 90-92. Defendants also argued that Plaintiffs had failed to present evidence of any damages and had therefore failed to establish an essential element of both their fraud and breach-of-contract claims. *Id.* at 92-95. They argued that there was no proof of Plaintiffs' damages caused by Defendants' conduct without damage models. *Id.* at 94. Finally, they argued that all Defendants were entitled to judgment in their favor with respect to Plaintiffs' accounting claims. *Id.* at 118.

---

[31] Defendants' written motion, which covered fewer than all claims, was supplemented during the hearing to cover all claims against all Defendants. Dkt. 552 at 85-86, 88-89.

12-cv-411
c/w 15-cv-455

Plaintiffs were permitted to respond to Defendants' motion. During that response, the Court specifically asked Plaintiffs what evidence they had to support reliance. Mr. Miller responded that the Plaintiffs "took [Defendants] at their word . . . ." *Id.* at 95-96. The Court asked Mr. Miller to identify where that evidence had been presented to the jury, and how a jury could conclude that the Plaintiffs had no knowledge of the inter-affiliate transactions they complained of. *Id.*; *see also id.* at 108-09 ("The Court: Well, you've just told me that this jury hasn't heard that."). Mr. Miller responded that the information came in through Mr. Kane's testimony. *Id.* at 96.

When the Court inquired into Plaintiffs' proof of damages, Mr. Miller argued that their damages could be established through exhibits that had been filed with the Court but not yet entered into evidence. *Id.* at 97. He claimed that Defendants' expert, Eric Krause, could sponsor a third-party report setting forth Plaintiffs' damages calculations. *Id.* at 97-99. The Court asked whether those damage calculations would pertain to their contract claim or their fraud claim, and Mr. Miller suggested that it would establish both. *Id.* at 99. The Court reminded Mr. Miller that it would be necessary to establish separate damages for the fraud claims and the breach-of-contract claims; Mr. Miller indicated he understood. *Id.* at 99, 103-04. Mr. Miller pointed to several other exhibits that, he claimed, would support Plaintiffs' damages claims. The Court noted that none of those exhibits had been admitted into evidence, and Mr. Miller indicated, once again, that he could introduce that evidence through Defendants' witnesses. *Id.* at 100-06. The Court asked Mr. Miller whether he had "any proof of a dollar amount of damages," and Mr. Miller responded that he did not "have the actual paper," but that he believed the damages would "exceed a million dollars before it's all over." *Id.* at 106.

Finally, the Court asked Mr. Miller to point to any documents or testimony to support their accounting claim. Mr. Miller responded that the "ownership documents" entitled Plaintiffs to an accounting, and that he was

also entitled to an accounting under *Pummill v. Hancock* and *Mittelstaedt*. *Id* at 107-119. The Court invited Mr. Miller to point to a specific citation demonstrating a right to an accounting under Oklahoma law; he failed to do so. *Id.* at 113-14. The Court then invited the remaining Plaintiffs to provide arguments in opposition to the Rule 50 motion. None of them took up the invitation. *Id.* at 114.

Following a brief recess, the Court construed Plaintiffs' arguments as a motion to reopen the record to cure the deficiencies identified in Defendants' Rule 50 motion. The Court granted that motion, allowing Plaintiffs an opportunity to introduce the evidence needed to support their claims. The Court specifically admonished Plaintiffs that they would need to cure "the deficiencies that [had] just been raised" and discussed by the parties, namely, deficiencies regarding "fraud reliance, fraud damages, [and] breach-of-contract damages." *Id.* at 119. The Court indicated that, if Plaintiffs had any evidence to cure those deficiencies, they must introduce that evidence so that the jury could "hear the evidence that . . . supports all the matters that [had] been discussed," including Plaintiffs' reliance on a fraudulent statement, Plaintiffs' damages, and the basis for Plaintiffs' accounting claims. *Id.* at 120-21. All Plaintiffs stated that they knew what was expected of them. *Id.* at 121-22. Plaintiffs indicated they would call Eric Krause, Mr. Kane, and Ms. Brown to cure the identified deficiencies. *Id.*

## G. Plaintiffs' Supplemental Evidence

At the close of the Rule 50 colloquy, Plaintiffs called Defendants' expert, Eric Krause, an economic consultant. Mr. Krause testified that he was familiar with oil and gas leases and had reviewed "thousands" of leases in his 20-plus-year career. Dkt. 552 at 125. Plaintiffs questioned Mr. Krause regarding oil and gas leases in general, the transactions and agreements discussed at trial, and the relationship of the various entities involved in producing, collecting, and selling Plaintiffs' gas. *Id.* at 125-57. Plaintiffs then asked Mr.

12-cv-411
c/w 15-cv-455

Krause to review Defense Exhibit 215.19, which reflected adjustments Mr. Krause made to calculations from a different (non-testifying) expert, Mr. Martindale. *Id.* at 157.[32] Mr. Krause testified that the exhibit was a "reflection of [damages calculations that] Mr. Martindale had performed" in 2015 for the four Plaintiffs. *Id.* at 165. Mr. Krause "disputed and disagreed with those calculations," which determined an underpayment of royalties in the following amounts: James Miller, $11,579.99 for underpaid royalties and $9,632.77 in interest; Sharon Rigsby Miller, $3,911.81 for underpaid royalties and $704.10 in interest; Janice Sue Parker, $6,969.12 for underpaid royalties and $6,171.79 in interest; and Larry Smith, $16,067.56 for underpaid royalties and $11,526.14 in interest. *Id.* at 165-169.[33]

On redirect, Mr. Krause clarified that he did not agree with the damages calculations, that he believed the calculations to be overstated, and that he had "not offered an opinion that there [were] any damages." *Id.* at 169. When Plaintiffs sought clarification on how much of the calculated damages were an overstatement, Mr. Krause replied "all of it." *Id.* at 170. Mr. Krause opined that the gas was sold at a reasonable price based on other contracts with third parties that allowed for similar deductions. *Id.* at 170-71. At no point during their examination did Plaintiffs elicit testimony concerning the data underlying the damages calculations that were set forth in Exhibit 215.19, nor did they use Mr. Krause to introduce or discuss that data. Mr. Krause did not provide a foundation or explanation for those calculations, nor did he explain how they were obtained.

Plaintiffs released Mr. Krause and re-called Robert Kane to the stand. After discussing the meaning of some of his prior testimony and the language

---

[32] The exhibit was preadmitted by Defendants. Dkt. 552 at 160.

[33] Mr. Krause acknowledged that interest would have continued to accumulate during the ten years following the underlying calculations. *Id.* at 169.

12-cv-411
c/w 15-cv-455

included on the check stubs, *id.* at 172-75, Plaintiffs asked Mr. Kane whether he thought that Plaintiffs "relied on" the check stubs or the indication that no deductions had been taken. *Id.* at 174-75. Defendants objected to that question, as well as others pertaining to what Plaintiffs knew, relied on, or believed. *Id.* The objections were sustained. *Id.* Plaintiffs then elicited testimony from Mr. Kane regarding the relationship between Bullseye Energy and Bullseye Operating, and Bullseye Operating's authority to act on behalf of Bullseye Energy. *Id.* at 175-77. Mr. Kane ultimately agreed that Bullseye Operating's name did not appear on any of Plaintiffs' leases, and that no Plaintiff had agreed to grant Bullseye Operating any rights to sell their gas. *Id.* at 178. At no point did Mr. Kane provide any new information concerning the amount of damages allegedly sustained by Plaintiffs, the extent to which Plaintiffs relied on Defendants' representations, or any Defendant's contractual or legal obligation to provide an accounting to Plaintiffs.

Plaintiffs withdrew their request to present evidence through Pam Brown. *Id.* at 179-80. The Court reminded Mr. Miller that it had re-opened the record and asked Plaintiffs whether they had any further record to make in support of their case-in-chief. *Id.* at 180. Mr. Miller indicated that Plaintiffs believed they had submitted the evidence necessary to establish their claims and would "stand on it." *Id.* at 182-83. Defendants re-urged their Rule 50 motion. The Court granted the motion with respect to all claims, concluding that Plaintiffs had failed to present any evidence that would support an accounting claim against any Defendant; had failed to present evidence that any of them had relied upon a fraudulent statement to their detriment; and had failed to demonstrate that they had been damaged by either the alleged fraud or the alleged breaches of their contracts. *Id.* at 185-89. Accordingly, the Court granted Defendants' motion on all remaining counts and stated that it would memorialize its decision in this written order.

12-cv-411
c/w 15-cv-455

## IV–Rule 50 Analysis

When reviewing a Rule 50 motion, a court may not "weigh the evidence, pass on the credibility of the witnesses, or substitute [its] conclusions for that of the jury." *Mason v. Oklahoma Turnpike Auth.*, 115 F.3d 1442, 1450 (10th Cir. 1997) (citations omitted), *overruled in part on other grounds by TW Telecom Holdings Inc. v. Carolina Internet Ltd.*, 661 F.3d 495 (10th Cir. 2011). Instead, the court must objectively review the evidence and determine whether *any* jury could find in favor of the non-moving party based on that evidence. *Id.* Judgment as a matter of law may be entered "only if the evidence points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion." *Id.* (citation omitted). Although the Rule 50 hurdle is high, it is not insurmountable, and courts "must enter judgment as a matter of law in favor of the moving party if there is no legally sufficient evidentiary basis . . . with respect to a claim or defense . . . under the controlling law." *Id.* (citation and quotation marks omitted, alterations in original). Thus, judgment as a matter of law must be entered if a plaintiff fails to present evidence that would support a finding in its favor with respect to any essential element of his claim. *Cf. Specialty Beverages, L.L.C. v. Pabst Brewing Co.*, 537 F.3d 1165, 1182 (10th Cir. 2008) (reversing grant of Rule 50 motion where the plaintiff had "presented sufficient evidence on each element of [the] constructive fraud claim").

### A. Breach-of-Contract Claim

To prevail on their breach-of-contract claims against Bullseye Energy and CEP Mid-Continent, each Plaintiff was required to introduce evidence that, if true, would permit a jury to find that (1) the Plaintiff entered into a contract with Bullseye Energy and CEP; (2) Bullseye Energy or CEP breached the contract; and (3) the Plaintiff suffered "damages as a result of that breach." *Emergency Servs. of Oklahoma, PC v. United HealthCare Ins. Co.*, 650 F. Supp. 3d 1211, 1220 (W.D. Okla. 2022) (citing *Morgan v. State Farm*

12-cv-411
c/w 15-cv-455

*Mut. Auto. Ins. Co.*, 2021 OK 27, ¶ 21, 488 P.3d 743, 748. The Court assumes that Plaintiffs have presented sufficient evidence to permit a jury to find in their favor with respect to the first two elements of their claims. But they failed to present evidence that would permit a jury to find in their favor with respect to the essential element of damages.

"Oklahoma law prohibits recovery of damages that are uncertain and speculative." *Weyerhauser Co. v. Brantley*, 510 F.3d 1256, 1267 (10th Cir. 2007) (citing *Great Western Motor Lines, Inc. v. Cozard*, 1966 OK 134, ¶ 8, 417 P.2d 575, 578). "Damages claimed for the breach of a contract cannot be recovered unless they are *clearly ascertainable*, both in their nature and origin . . . ." *Chorn v. Williams*, 1940 OK 38, ¶ 8, 99 P.2d 1036, 1037 (emphasis added); *see also Fowler v. Lincoln Cnty. Conservation Dist.*, 2000 OK 96, ¶ 17, 15 P.3d 502, 507 (same). Damages that are "speculative and uncertain" are "not compensable." *Griffen v. City of Oklahoma City*, 2 F.3d 1160, 1993 WL 307998, at *1 (10th Cir. Aug. 10, 1993) (concluding that the plaintiffs had failed to establish an essential element of their negligence claim); *see Fowler*, 2000 OK 96, ¶ 17, 15 P.3d at 507 (recognizing that damages must be "the natural and proximate consequence of the breach of the contract and not speculative and contingent").

A jury left to determine the amount of damages owed to Plaintiffs could do nothing other than speculate. Plaintiffs did not introduce a complete record of the pay stubs showing the royalties they were paid. They have not introduced a set of statements or records detailing the transportation fees withheld by Wild West/White Hawk. And they have not provided evidence or testimony proving the amount of transportation fees that would have flowed to each Plaintiff if they had been paid out to Bullseye Operating rather than deducted by Wild West/White Hawk. Plaintiffs did not even take the stand to testify as to the amounts they received and the information they had

12-cv-411
c/w 15-cv-455

regarding the amounts withheld. Simply put, there is no substantive evidence that a jury could use to calculate a damages award.

Plaintiffs did introduce eleven pages of pay stubs belonging to Ms. Miller, and Defendants' exhibits provide evidence of three more payments—one to Ms. Miller and two to Mr. Miller. The Court considered, sua sponte, whether those documents could support a very limited damages award to Mr. Miller (with respect to the invoices depicted in Defendants' Exhibits 208 and 209) or Ms. Miller (with respect to the invoices depicted in Plaintiffs' Exhibit 5 and Defendants' Exhibit 222).[34] The Court finds that, for several reasons, a jury could not return even a limited damage award for either of the Millers based on these documents.

First, the payments depicted in Defendants' Exhibits 208 and 209 cannot support an award of damages because those payments were made in 2004. This case was not filed until 2012, and Oklahoma's statute of limitations bars any claims that arose more than five years prior to the filing of the original complaint. Okla. Stat. tit. 12, § 95(A)(1) (establishing a five-year statute of limitations for actions on written contracts); *see Express Servs., Inc. v. King*, No. CIV-15-1181-R, 2017 WL 3741555, at *4 (W.D. Okla. Aug. 30, 2017) (concluding that the "discovery rule does not apply to breach of contract claims" brought under Oklahoma law); *Southcrest, L.L.C. v. Bovis Lend Lease, Inc.*, No. 10-CV-0362-CVE-FHM, 2010 WL 4053544, at *3 (N.D. Okla. Oct. 14, 2010) (same). If this case had been given to a jury to decide, the jury would have been instructed on this limitation. There can be no recovery based on Defendants' Exhibits 208 and 209.

Second, the evidence presented at trial does not establish that *Ms. Miller*, who received the checks associated with Plaintiffs' Exhibit 5 or

---

[34] Plaintiffs' exhibits did not include check stubs for either Larry Smith or Janice Parker. *See* Dkt. 548-2.

12-cv-411
c/w 15-cv-455

Defendants' Exhibit 222 (both of which fall within the applicable statutory limitations period), was damaged by any alleged underpayment associated with those checks. Although Ms. Miller is identified as the payee in those exhibits, the evidence did not establish that she—as opposed to some other party—would have been damaged by any underpayments or miscalculations connected to those documents. Ms. Miller is not identified as a mineral owner on any lease admitted into evidence,[35] and Plaintiffs have not introduced any assignments granting her contractual rights in or to any lease.[36] Although all parties appear to agree that Ms. Miller was assigned an interest in at least one well at some point, there is no stipulation to that effect, no exhibit depicting that assignment, and no testimony establishing that any purported assignment took place prior to the payments at issue (2014 for the payment depicted in Defendants' Exhibit 222, and 2018-19 for the payments identified in Plaintiffs' Exhibit 5). There is therefore no *evidence* that these payments were made to Ms. Miller because she had a contractual right to receive them, nor is there *evidence* that she (as opposed to some other party) was damaged by any underpayments corresponding to those checks. A jury could not award damages to *Ms. Miller* because there is no evidence that *Ms.*

---

[35] The leases admitted into evidence identify the following mineral owners: James Miller (Plaintiffs' Exhibit 3), James Miller and Roger Swanwick (Exhibit 3-A), Larry and Dee Smith (Exhibit 3-B), and C.L. Burwell (Exhibit 3-C).

[36] Plaintiffs attempted to introduce testimony that Ms. Miller obtained an interest in the lease identified in Plaintiffs' Exhibit 3-A through Mr. Kane, but Mr. Kane's testimony did not prove the existence or timing of any assignment. *See* Dkt. 551 at 8-9 ("Q: . . . . You're aware that I [Mr. Miller] assigned some of these leases to my wife? A: Yes, I am. Q: Okay, so these same leases would apply to her also; is that correct? A: I don't know that. I don't have information here about the assignment of these leases."); *id.* at 76 ("Q: . . . Now, do those leases apply to me [Ms. Miller] as you know it? A: If they were assigned to you . . . and recorded, then they are still in full force and effect with you as the . . . lessor instead of your husband."); *see also* Dkt. 550 at 118-19 (discussion between counsel and the Court regarding representation by Mr. Miller that Plaintiffs' Exhibits 3 and 3-A, which identify "James Miller" as the mineral owner, were his leases, resulting in the withdrawal of Defendants' objection that one of the leases belonged to Ms. Miller).

12-cv-411
c/w 15-cv-455

*Miller* was damaged by any alleged underpayment associated with these exhibits.

Plaintiffs might argue that a jury should be permitted to either (a) infer that Ms. Miller has a right to receive an award of damages based on the fact that she received checks associated with the wells, or (b) award damages in the alternative to either Ms. Miller or Mr. Miller based on those checks, which appear to be tied to the wells identified in Exhibits 3 and 3-A. But any damage award premised on this logic would, by necessity, be the result of inferences and assumptions, not evidence. Mr. and Ms. Miller were warned that they would *each* be required to prove the amount of *their damages* by admissible evidence. Dkt. 528 at 12-14. It would not do to ask a jury to assume that Ms. Miller was damaged by a contractual breach in the absence of proof that she had any contractual rights. Nor would it do to ask a jury to speculate as to the amount of damages that might be due to Mr. Miller under the assumption that payments made to his wife should be attributed to him.

Even if the Court were to permit speculation as to who was damaged by any alleged underpayments associated with Plaintiffs' Exhibit 5 or Defendants' Exhibit 222, judgment against Plaintiffs would still be proper because those exhibits do not establish any damages at all. The exhibits are proof of payments made, not amounts withheld. The exhibits do not show the extent of any funds that should have gone to any Plaintiff under the terms of any contract.

To give Plaintiffs the benefit of every possible doubt, the Court attempted to back-calculate a damages award based upon the information in Plaintiffs' Exhibit 5. The Court was unable to do so without engaging in speculation. The Court first considered dividing the amount paid to Ms. Miller (depicted in the "check amount" column) by 0.7, reasoning that if the checks reflected seventy percent of the original amount allocable to a Ms. Miller, then the simple fix would be to pay her one hundred percent of the "original"

12-cv-411
c/w 15-cv-455

amount. The problem with this approach is twofold: First, it requires speculation because it is not clear from the evidence that the transportation fees associated with these check stubs was paid on a percentage basis, rather than a fixed-fee basis.[37] Second, it is not clear from the evidence how the taxes depicted on the invoices should be accounted for, and the Court was left to guess whether to include the taxes (or a different number) when back-calculating a percentage-based damages award.[38]

After attempting to construct even a limited damages model based on the evidence available—and coming up short—the Court concludes that it would not be appropriate to submit this case to a jury. This is not a case where damages could be calculated using a simple mathematical equation that any lay juror could perform. Determining the amount of damages owed to

---

[37] One could assume that the transportation fees in 2018 and 2019 were calculated on a percentage basis because the invoices in Plaintiffs' Exhibit 5 all reflect a price that is below $2.90 per MMBTU. But it is not clear from the record that the price per MMBTU on Plaintiffs' pay stubs is the same price per MMBTU that was used to determine whether the eighty-seven-cent cap applied to Wild West/White Hawk's transportation fee. Indeed, it seems unlikely that this would be the case because the price per MMBTU received by Plaintiffs, which would be reduced by the transportation fee, would necessarily be lower than the price per MMBTU received by Wild West/White Hawk. A jury attempting to calculate damages based on these invoices would be required to guess at whether the cap would or would not apply and do so without any guiding evidence or expert assistance. That is not a jury's function.

Calculating damages on a fixed-fee basis (if it applied) would present its own difficulties because it is unclear from the record what percentage of the fixed fee would be allocated to any individual Plaintiff. Given the presence of an MMBTU factor on the check stubs, the Court assumes it might be necessary to know what percentage of the gas sold to Wild West/White Hawk was attributable to each Plaintiff in order to allocate a portion of the transportation fee to that Plaintiff. That evidence is not in the record.

[38] Looking again at Plaintiffs' Exhibit 5, it appears that Plaintiffs' checks were determined by multiplying Plaintiffs' volume (column 1) by the MMBTU factor (column 2) and the price per MMBTU (column 3) to obtain the gross value (column 4). The meter taxes were then subtracted to determine the net value, which is multiplied by the owner decimal (column 10) to obtain the check amount (column 12).

12-cv-411
c/w 15-cv-455

Plaintiffs—even on the few pay stubs introduced into evidence—requires more information than has currently been provided, including (a) evidence of which transportation fee applied to which payment; (b) evidence regarding what portion of the transportation fee would have flowed through to a particular Plaintiff if the fee had not been withheld; (c) whether and to what extent taxes should be considered in determining a damages award; and (d) expert advice as to how to interpret and understand documents and perform calculations that are outside the purview of the ordinary layperson's experience.

After years of discovery, Plaintiffs should have been able to present the evidence the Court just described. They failed to do so. Plaintiffs therefore failed to present evidence that would permit a jury to calculate damages based on "judgment, not guesswork." *Noll v. Apex Surgical, LLC*, No. CIV-08-1379-D, 2010 WL 2813430, at *6 (W.D. Okla. July 15, 2010) (citation and quotation marks omitted) (concluding that the plaintiff had presented minimally sufficient evidence to proceed to trial by presenting evidence of past earnings and expert evidence that earnings would decline after surgery). *Cf. Great W. Motor Lines, Inc. v. Cozard*, 1966 OK 134, ¶ 8, 417 P.2d 575, 578 (affirming demurrer where "the evidence . . . with respect to the damages . . . was vague," and the extent of damages "could have easily been shown by copies of bills, receipts, paid invoices, or even by cancelled checks"). Plaintiffs' contract claims therefore cannot go to the jury.

Plaintiffs argue that they have presented evidence of damages using Defendants' Expert, Eric Krause, who testified regarding a damages calculation set forth in Defendants' Exhibit 215.19. But neither Mr. Krause nor any other witness vouched for the calculations in that exhibit. To the contrary, Mr. Krause testified that the calculations in the exhibit were entirely overstated. Dkt. 552 at 165. Ultimately, Mr. Krause opined that Plaintiffs had not suffered any injury or damages due to Defendants' conduct. *Id.* at 169-70. Mr. Krause's testimony, then, does not provide a basis for a damages award.

12-cv-411
c/w 15-cv-455

The exhibit referred to by Mr. Krause fares no better. That document is not substantive evidence of Plaintiffs' damages. Instead, it reflects one non-testifying expert's opinion regarding the damages Plaintiffs might have suffered based upon assumptions that were never articulated and data that was never identified. There is no evidence in the record that a jury could use to understand, evaluate, or weigh the information in the exhibit—and a jury is tasked with weighing evidence, not accepting it wholesale. Plaintiffs did not articulate the substantive evidence of record that would support the calculations in Exhibit 215.19, nor did they present any expert testimony explaining how the calculations in the exhibit could be linked to the evidence of record. The exhibit amounts to nothing more than the ipse dixit of an absent expert, and it is not sufficient to support an award of damages. *See Haynes Trane Serv. Agency, Inc. v. Am. Standard, Inc.*, 51 F. App'x 786, 796 (10th Cir. 2002) (concluding that the district court should have granted a Rule 50 motion when the only expert testimony on damages centered on damages resulting from the fact of termination, rather than damages from the failure to give proper notice of termination, which was the only contractual breach at issue). The only expert opinion offered at trial was that Plaintiffs suffered no damages at all as a result of Defendants' conduct. Dkt. 552 at 169-70. There is, therefore, no expert testimony that would support an award of damages.

"Matters capable of proof should not be left to conjecture. Verdicts should be based upon evidence, not upon guesswork, especially concerning things so easily capable of proof." *Spaulding Mfg. Co. v. Cooksey*, 1912 OK 653, ¶ 2, 34 Okla. 790, 127 P. 414, 415. A jury resolving Plaintiffs' claims would be left to guess and speculate as to the amount of damages that Plaintiffs suffered. Plaintiffs should have been able to present evidence to support their claim for damages—an essential element of their claim that was "easily capable of proof." *Id.* They bore the burden of "establish[ing] by competent evidence" the damage they suffered. *Chorn*, 1940 OK 38, ¶ 8, 186 Okla. 646, 99

36

12-cv-411
c/w 15-cv-455

P.2d at 1037. But they did not present any "competent evidence reasonably tending to sustain an action in damages." *Id.* The only direct testimony regarding the damages sustained by Plaintiffs was that Plaintiffs suffered no damages at all. Dkt. 169-70. That testimony cannot support an award of damages. *Chorn*, 1940 OK 38, ¶ 9, 186 Okla. 646, 99 P.2d 1036, 1037–38 (sustaining a demurrer where "the only direct and positive testimony in the record disclose[d] that the business had sustained a loss since its inception," foreclosing a finding of damages resulting from an alleged breach of contract). And the remaining evidence is insufficient to permit a jury to determine that Plaintiffs suffered clearly ascertainable damages because of Defendants' conduct. Plaintiffs failed to establish this essential element of their breach-of-contract claims. The Court must enter judgment in Defendants' favor with respect to those claims.

## B. Fraud Claim

To recover for fraud, each Plaintiff was required to introduce evidence demonstrating that (1) a Defendant "made a material misrepresentation"; (2) the representation was false; (3) that Defendant knew the representation was false or made the representation "in reckless disregard of the truth"; (4) that Defendant made the representation "with the intention that it should be acted upon" by the Plaintiff; (5) the Plaintiff "acted in reliance upon" the representation; and (6) the Plaintiff "thereby suffered injury." *Sturgeon v. Retherford Publications, Inc.*, 1999 OK CIV APP 78, ¶ 34, 987 P.2d 1218, 1228. All these elements "must be proven with a reasonable degree of certainty, and all of them must be found to exist." *Ramsey v. Fowler*, 1957 OK 61, ¶ 6, 308 P.2d 654, 656; *see D & H Co. v. Shultz*, 1978 OK 71, ¶ 11, 579 P.2d 821, 824.

12-cv-411
c/w 15-cv-455

Defendants argue that Plaintiffs failed to establish the essential elements of damages and reliance. The Court agrees.[39] As this Court has already explained, Plaintiffs failed to present competent evidence of the damages they allegedly incurred because of Defendants' misconduct. *See* Section IV(A), *supra*.[40] But even if Plaintiffs could establish that essential element, their fraud claim would nevertheless fail because they failed to present evidence that they relied upon the misrepresentations allegedly made by Bullseye Energy and CEP.

To establish reliance, a plaintiff must present some evidence that the plaintiff took (or failed to take) some step, or assumed a particular position, based upon a fraudulent statement. *E.g., Applegate v. State Farm Mut. Auto. Ins. Co.*, 61 F. App'x 552, 555 (10th Cir. 2003). A factfinder cannot simply infer reliance on a misrepresentation based on the fact that a misrepresentation was made. *Alexander v. Smith & Nephew, P.L.C.*, 90 F. Supp. 2d 1225, 1235 (N.D. Okla. 2000) (granting summary judgment on fraud claim, which required proof that the false statements caused a doctor to act in reliance on those statements, where the plaintiff "put[ ] forward no material facts in support of . . . reliance"); *see Dobbs v. Wyeth Pharms.*, 848 F. Supp. 2d 1335, 1340 (W.D. Okla. 2012) (refusing to speculate as to reliance and granting summary judgment where the only person who could have relied on the representation

---

[39] Defendants also argue that there is no evidence that CEP made false statements to Plaintiffs. The Court disagrees. A jury could conclude that check stubs issued on behalf of CEP were false and that the statements on those stubs were chargeable to CEP.

[40] Unlike Plaintiffs' contract claims, Plaintiffs' fraud claims are subject to a two-year statute of limitations. *See* Okla. Stat. tit. 2 § 95(A)(3). Although Plaintiffs could have argued that the discovery rule delayed the accrual of their claims, they did not present evidence that they did not discover Defendants' alleged fraud until 2009 or later. Accordingly, the two-year statute of limitations applies, and bars Plaintiffs from recovering for damages incurred prior to 2009. With respect to later damages, the same factual deficiencies that prevent Plaintiffs from establishing damages for their breach-of-contract claims likewise prevent them from establishing that they suffered damages as a result of Defendants' alleged fraud.

12-cv-411
c/w 15-cv-455

was the physician, who testified that she did not rely on the defendant's statements). Instead, a plaintiff seeking to establish reliance must present some testimony demonstrating how the fraudulent statement affected his or her behavior. A plaintiff who fails to present this evidence cannot sustain a fraud claim. *Applegate*, 61 F. App'x at 555 (affirming grant of summary judgment due to lack of reliance where the plaintiff "fail[ed] to demonstrate that he acted on the alleged misrepresentation of the liability claim" because he did not accept the purposefully understated offer).

Plaintiffs failed to introduce evidence of reliance. They might have been able to establish this essential element by taking the stand and testifying that they relied on Bullseye Energy and CEP's allegedly false statements (and describing how they would have acted if the true facts were known to them). *See Cook v. Med. Sav. Ins. Co.*, No. CIV-05-289C, 2006 WL 1663783, at *2 (W.D. Okla. June 12, 2006), aff'd, 287 F. App'x 657 (10th Cir. 2008) (denying judgment as a matter of law where the plaintiff "testified that he relied upon [the] representations in deciding to purchase the policy"). But they did not do so. None of the Plaintiffs testified. None of them presented evidence that they ever read, let alone relied upon, misrepresentations allegedly made by Defendants. And none of the Plaintiffs presented evidence as to how they would have responded differently if they had known the facts that were wrongfully withheld from them. The Court provided Plaintiffs multiple opportunities to present evidence demonstrating their reliance on the alleged fraud. They failed to avail themselves of those opportunities despite being warned that they were required to present evidence of their reliance to the jury. The Court is sympathetic to the fact that Plaintiffs appear pro se, but a case cannot proceed to trial on sympathy alone. Because Plaintiffs never presented evidence that they relied on the allegedly false representations of Bullseye Energy and CEP, and because they could not establish that they were

12-cv-411
c/w 15-cv-455

damaged as a result of that reliance, their fraud claims cannot proceed to the jury for deliberation.

## C. Accounting Claim

To prevail on their accounting claims, each Plaintiff was required to prove either that (1) the Defendant owed him or her "a legal duty to account created by contract and fiduciary status"; (2) the Plaintiff had a "cognizable legal right to recover [against the Defendant], but no other adequate remedy at law"; or (3) the Plaintiff has an enforceable accounting right and the Court may assume equitable jurisdiction over it. *See Cell Energy, LLC v. Devon Energy Prod. Co., L.P.*, No. CV 16-188 GJF/LAM, 2016 WL 9408580, at *4 (D.N.M. Oct. 11, 2016) (quoting *Margaret Blair Trust v. Blair*, 2016 OK CIV APP 47, ¶¶ 16-19, 378 P.3d 65, *reh'g denied* ( June 15, 2016)). Plaintiffs have not pointed to any contractual provisions obligating CEP or Bullseye Energy to provide an accounting.

Plaintiffs also failed to establish that Bullseye Energy, CEP, or KRS&K owed Plaintiffs a non-contractual legal duty to provide an accounting. Indeed, Plaintiffs have paid so little attention to this claim that they have very nearly abandoned it. The most Plaintiffs did was to argue that they are entitled to an accounting under *Pummill v. Hancock Exploration LLC*, 2018 OK CIV APP 48, 419 P.3d 1268, *Howell v. Texaco Inc.*, 2004 OK 92, 112 P.3d 1154, and *Mittelstaedt v. Santa Fe Mins., Inc.*, 1998 OK 7, 954 P.2d 1203. The Court has reviewed those cases and concludes that none of them establish that Plaintiffs have a right to an accounting. *Cf. Pummill*, 2018 OK CIV APP 48, ¶ 21, 419 P.3d at 1274 (resolving a "contract dispute, with neither party seeking relief in the form of an injunction, accounting, termination or cancellation of the leases, or other equitable relief"). Because Plaintiffs have not presented evidence establishing that the three Defendants owed a contractual or other duty to account to Plaintiffs, their accounting claims fail as a matter of law.

12-cv-411
c/w 15-cv-455

## V–Conclusion

For the reasons set forth above, the Court holds that Plaintiffs failed to present evidence that would permit a jury to find in their favor with respect to any of their claims, and that judgment as a matter of law should be granted to Defendants on all claims. Defendants' oral motion for judgment as a matter of law is therefore granted.

DATED this 22nd day of January 2026.

_____

JOHN D. RUSSELL
*United States District Judge*